**ORAL ARGUMENT REQUESTED**

**No. 15-5070**
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

FRIENDS OF ANIMALS,
Appellant,

v.

SALLY JEWELL, in her official capacity as the Secretary of the Interior,
and
the U.S FISH AND WILDLIFE SERVICE, an agency of the United States
Appellees,

and

SAFARI CLUB INTERNATIONAL,
Intervenor-Appellee.

_____

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. Civ. No. 14-0357

_____

APPELLANT'S OPENING BRIEF

Michael Ray Harris
Jennifer E. Barnes
Friends of Animals
7500 East Arapahoe Road, Suite 385
Centennial, CO 80112
Telephone: 720-949-7791
*Counsel for Appellant*

# TABLE OF CONTENTS

GLOSSARY ................................................................................................ vii

CORPORATE DISCLOSURE STATEMENT .................................................1

CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED CASES ........................................................................................................1

    1. Parties ...............................................................................................1

    2. Rulings Under Review ......................................................................2

    3. Related Cases ...................................................................................2

INTRDOCUTION ........................................................................................3

STATEMENT OF JURISDICTION ................................................................4

ISSUES FOR REVIEW .................................................................................5

STATEMENT OF THE CASE ........................................................................6

LEGAL AND FACTUAL BACKGROUND ......................................................6

    A.    The Endangered Species Act ...................................................6

        1.    The ESA places a high priority on non-native species .......6

        2.    The "take" prohibition and Section 10 permits ..................7

    B.    The Three Antelope Species ....................................................9

    C.    Regulation of the Three Antelope Species .............................12

    D.    The Special Interest Antelope Budget Rider ...........................17

    E.    FWS's Republishing Of The Illegal Sport-Hunting Rule .......18

STATEMENT OF THE CASE ......................................................................19

SUMMARY OF ARGUMENT .....................................................................20

STANDARD OF REVIEW ...........................................................................22

ARGUMENT .............................................................................................23

    A.    Standing: Congress's Inclusion of Section 127 in the 2014 Federal Budget Caused FoA and Its Members to Suffer Information Injury Which Could Be Redressed By The Court If Section 127 Is Found Unconstitutional ......................23

1. Under FoA's reading, Section 10 of the ESA requires the Secretary to disclose information about the legalized, permitted take of captive members of the Three Antelope Species ...................................................24

2. Through enactment of Section 127, Congress denied FoA information it otherwise has a statutory right to obtain ..........................................................25

3. Section 127 deprives FoA of information that would have been helpful in its ongoing work to protect African antelope .................................................28

B. Constitutional Arguments: The Special Interest Rider Infringes on the Judicial Power of Article III Courts in Violation of the Separation of Powers Doctrine ......................31

1. The Separation of Powers Doctrine ............................................31

2. Section 127 is unconstitutional under *Plaut* .........................32

3. Section 127 is unconstitutional under *Klein* .........................35

a. The "without regard to any other provision of law" line of cases does not change the fact that Section 127 is unconstitutional ..............................................39

4. The wolf rider case involved an actual change of law; it removed judicial review under the APA ..................................45

C. APA Arguments ..................................................................47

1. Even if Constitutional, Section 127 does not preclude judicial review or direct the Court to ignore the ESA .......47

CONCLUSION ........................................................................49

CERTIFICATE OF COMPLAINCE ........................................................50

CERTIFICATE OF SERVICE ........................................................51

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Salazar,* 672 F. 3d 1170
(9TH Cir. 2012)...................................................................................45-47

*Alliance for the Wild Rockies v. Salazar,* 800 F. Supp. 2d 1123
(D. Mont. 2011).................................................................................39-41

*Am. Canoe Ass'n v. City of Louisa Water Treatment Plant,*
389 F.3d 536 (6TH Cir. 2004).......................................................... 24, 29-30

*ASPCA v. Feld Entm't, Inc.,* 659 F.3d 13 (D.C. Cir. 2011)................... 24, 26-27

*Biodiversity Assocs. v. Cables*, 357 F.3d 1152 (10TH Cir. 2004).....................44

*Bowen v. Michigan Academy of Family Phys.*, 476 U.S. 667 (1986)......47-48

*Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. 2000) .................................22

*Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125 (D.D.C. 1979) ...........7

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)............................................................................ 33, 44

*Cnty. Of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)...................23

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United
States*, 482 F.3d 1157 (9TH Cir. 2007).......................................... 39, 40-42

*Conservation Force v. Salazar*, 2012 WL 1059732 (D.D.C. Mar. 30,
2012) .....................................................................................................8

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004).......43

*Environmental Protection Info. Ctr., Inc. v. Simpson Timber Co.,* 1999
U.S. Dist. LEXIS 4234 (N.D. Cal. Mar. 30, 1999) ....................................44

*Estate of Charlot v. Bushmaster Firearms, Inc.,* 628 F. Supp. 2d 174
(D.D.C. 2009).......................................................................................38

*FEC v. Akins*, 524 U.S. 11 (1998)...................................................... 24, 29

*Foundation on Economic Trends v. Lyng*, 943 F.2d 79
(D.C. Cir. 1991)................................................................................ 24, 28-29

*Friends of Animals v. Salazar*, 626 F. Supp. 2d 102
(D.D.C. 2009).................................................................... 13, 14, 43, 49

*Friends of the Earth v. Laidlaw Entvl. Servs.,* 528 U.S. 167 (2000)...............23

*Gerber v. Norton,* 294 F.3d 173 (D.C. Cir. 2002) ....................................25

*Gordon v. United States,* 117 U.S. Appx. 697 (1864) .............................33

*Grey v. First Winthrop Corp.,* 989 F.2d 1564 (9TH Cir. 1993)...........................38

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982)........................................28

*Hayburn's Case,* 2 U.S. 409 (1792)......................................................33-34

*James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085 (D.C. 1996) ............22

*Judicial Watch v. United States DOC,* 583 F.3d 871 (D.C. Cir. 2009)............28

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ...........................23

*Marbury v. Madison,* 5 U.S. 137 (1803).................................................32

*Miller v. French,* 530 U.S. 327 (2000) .............................................. 33, 38

*Mount Graham Coalition v. Thomas,* 89 F.3d 554
(9TH Cir. 1996)...............................................................................35, 39, 42

*National Coalition to Save Our Mall v. Norton,* 269 F.3d 1092
(D.C. Cir. 2001)...............................................................................46-48

*National Wildlife Federation v. Marsh,* 568 F. Supp. 985 (D.D.C. 1983)....44

*Peters v. National R.R. Passenger Corp.,* 966 F. 2d 1483
(D.C. Cir. 1992)................................................................................22

*Plaut v. Spendthrift Farm,* 514 U.S. 211
(1994) ...............................................................................4, 31-35, 37, 40

*Public Citizen v. Department of Justice,* 491 U.S. 440 (1989) .................28-29

*Robertson v. Seattle Audubon Society,* 503 U.S. 429 (1992) ............ 37-38, 41

*Safari Club Int'l v. Jewell,* 960 F. Supp. 2d 17 (D.D.C. 2013) ...................12-13

*Safari Club Int'l v. Salazar,* 704 F. 3d 972 (D.C. 2013) .....................................22

*Shays v. FEC,* 528 F.3d 914 (D.C. Cir. 2008).....................................................28

*Sierra Club v. Babbitt,* 65 F.3d 1502 (Cir. 1995).................................................43

*State of Pennsylvania v. The Wheeling and Belmont Bridge
Company,* 59 U.S. 421 (1855) ...................................................... 35-36, 44

*Stop H-3 Ass'n v. Dole,* 870 F.2d 1419 (9th Cir, 1989) ............................. 39, 42

*TVA v. Hill,* 437 U.S. 153 (1978).................................................................43

*United States v. Klein*, 80 U.S. 128 (1871) ................................................... 4, 36-37

*United States v. O'Grady*, 89 U.S. 641 (1875) ........................................................ 33

*United States v. United States District Court*, 407 U.S. 297 (1972) .............. 31

*Wayman v. Southard*, 23 U.S. 1 (1825) ..................................................................... 32

*Zivotofsky v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006) ............................... 28

## Statutes

5 U.S.C. § 552 ............................................................................................................. 25

5 U.S.C. § 702 ............................................................................................................. 44

5 U.S.C. § 706 ............................................................................................................. 23

16 U.S.C. § 1531 ..................................................................................................... 6, 8

16 U.S.C. § 1532 ...................................................................................................... 7-8

16 U.S.C. § 1538 ......................................................................................................... 7

16 U.S.C. § 1539 .............................................................................................. 7, 8, 24-25, 27

28 U.S.C. § 1291 ......................................................................................................... 4

28 U.S.C. § 1331 ......................................................................................................... 4

## Regulations

50 C.F.R. § 10.12 ........................................................................................................ 7

50 C.F.R. § 13.21 ........................................................................................................ 8

50 C.F.R. § 17.21 ............................................................................. 13-14, 18-19, 25

## Rules and Procedures

Fed. R. App. P. 4(a)(1)(B) ........................................................................................ 5

## Federal Register

68 Fed. Reg. 1,826 (Jan. 14, 2003) ....................................................................... 7-8

70 Fed. Reg. 5118 (Feb. 1, 2005) ............................................................................ 12

70 Fed. Reg. 52310 (Sept. 2, 2005) .............................................................. 9-11, 13

70 Fed. Reg. 71,554 (Nov. 29, 2005) ...........................................................................7

77 Fed. Reg. 431 (Jan. 5, 2012) ..................................................................................15

78 Fed. Reg. 30325 (May 22, 2013)............................................................................27

78 Fed. Reg. 33790 (June 5, 2013).......................................................... 7, 11-12, 15

78 Fed. Reg. 35201 (June 12, 2013) ...................................................................... 7, 15

78 Fed. Reg. 56922 (Sept. 16, 2013) ..........................................................................27

79 Fed. Reg. 4171 (Jan. 24, 2014)...............................................................................27

79 Fed. Reg. 15250 (March 19, 2014) .................................................................18-19

## **Other**

160 Cong. Rec. H475-01....................................................................................18

Cass R. Sunstein, *Informational Regulation and Informational Standing: Akins and Beyond*, 147 U. Pa. L. Rev. 613 (1999) ...............................................29

H.R. Rep. No. 93-412 (1973) .........................................................................................7

Paul A. Diller, *When Congress Passes an Intentionally Unconstitutional Law: The Military Commissions Act of 2006,* 61 SMU L Rev 281 (2008) ...................................................................................................................48-49

The Federalist No. 47 (J. Cooke ed. 1961) ................................................................31

The Federalist No. 78 (J. Cooke ed. 1961) ................................................................32

The Federalist No. 81 (J. Cooke ed. 1961) ...................................................... 21, 32

# GLOSSARY

**Antelope I:** *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009).

**Antelope II:** *Exotic Wildlife Association, et al. v. United States Department of the Interior, et al.,* Case No. 12-cv-00340 (D.D.C.).

**Antelope III:** *Safari Club International v. Salazar, et al.*, Case No. 11-cv-01564 (D.D.C.).

**Antelope IV:** *Friends of Animals v. Ashe et al.*, 1:13-cv-1580 (D.D.C.).

**APA:** Administrative Procedure Act.

**ESA:** Endangered Species Act.

**FoA:** Friends of Animals.

**FWS:** United States Fish and Wildlife Service.

**SCI:** Safari Club International.

**Section 127 or Budget Rider:** Section 127 of the Consolidated Appropriations Act, 2014 (H.R. 3547, 113th Cong., S. 127).

**Sport-Hunting Rule:** Regulation that Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle Certain Prohibitions. 70 Fed. Reg. 52319 (September 2, 2005).

**Three Antelope Species:** scimitar-horned oryx (*Oryx dammah*), dama gazelle (*Gazella dama*), and addax (*Addax nasomaculatus*).

**CORPORATE DISCLOSURE STATEMENT**

Appellant, Friends of Animals ("FoA"), is a 501(c)(3) not-for-profit animal advocacy organization incorporated in the state of New York since 1957. FoA has no parent, subsidiary or affiliate. FoA has never issued shares or debt securities to the public.

**CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED CASES**

**1. Parties:**

Appellant, FoA, is a membership organization that seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free living and domestic animals. FoA engages in a variety of advocacy programs in support of these goals. FoA informs its members of its advocacy work through its magazine (*Act'ionLine)*, its website, and other published reports.

FoA also regularly participates in the various processes to protect threatened and endangered species under the Endangered Species Act ("ESA") including the listing process and the process for issuance of so-called lawful take permits. FoA has, in particular, worked for more than a decade to protect the three species of African antelope that were stripped of ESA protections by the legislation and regulations at issue in this appeal.

Appellees are: (1) the Honorable Sally Jewell, in her capacity as the Secretary of the Interior, who is one of two U.S. cabinet-level official responsible for complying with the ESA; and (2) the U.S. Fish and Wildlife Service ("FWS"), a federal agency within the Department of Interior to whom Secretary Jewell has delegated her responsibilities for complying with the ESA.

1

The Appellee-Intervenor, the Safari Club International ("SCI"), is an organization comprised of hunters, including individuals that kill threatened and endangered animals for sport. SCI has fought for more than a decade to prevent ESA protections for the three species of African antelope and for the ability of its members to continue to hunt these animals. SCI lobbied Congress to enact the legislation at issue in this case.

## 2. Rulings Under Review:

FoA seeks review of the United States District Court Judge Beryl A. Howell's Order Granting the Federal Government's Motion for Summary Judgment and Denying FoA's Motion for Summary Judgment, and the underlying Memorandum Opinion. *Friends of Animals v. Jewell et al.*, No. 14-00357, slip op. (D.D.C. June 23, 2014), Appellant's Appendix ("App.") at 229-51.

## 3. Related Cases:

This case has not previously been on appeal. This case is related to *Safari Club International v. Jewell*, No. 15-5300, which challenges various FWS rules that regulate, under the ESA, captive populations of the three African antelope species at issue in this appeal. On May 26, 2015, the Court issued an order holding Appeal No. 15-5300 in abeyance pending the outcome of this appeal. Order Continuing Abeyance, *Safari Club Int'l v. Jewell*, No. 13-5300, Dkt. #1553996 (D.C. May 26, 2015).

///

///

///

## INTRODUCTION

This case involves Section 127 of the Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, § 127 (2014) ("Section 127" or "Budget Rider"),[1] which directs the Secretary of the Interior and the U.S. Fish and Wildlife Service (collectively, "FWS" or "Federal Defendants") to reissue a 2005 regulation (the so-called "Sport-Hunting Rule") that exempts the U.S. captive-bred populations of endangered scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus)*, and dama gazelle *(Gazella dama*) (collectively, the "Three Antelope Species") from regulation under the ESA.

Section 127 is aimed at undermining a series of district court cases dating back to 2006. The first of these cases, *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009), was resolved in 2009 by former Judge Henry H. Kennedy, who struck down the Sport-Hunting Rule as contrary to the permitting process set forth by Congress in Section 10 of the Endangered Species Act ("ESA"). In that case, the district court interpreted Section 10 to require private, for-profit hunting ranches that breed and raise the Three Antelope Species in captivity for the purpose of trophy hunting to apply for and obtain individual permits from FWS. Judge Kennedy's interpretation of Section 10 in *Friends of Animals v. Salazar* is at the center of two other ongoing civil cases concerning the legal status of the captive populations of these species. In *Safari Club International v. Salazar*, 11-cv-01564 (D.D.C. 2011), which is now on appeal to this Court, the sport-hunting industry seeks to end run Judge Kennedy's interpretation of the ESA by challenging the FWS's 2005 decision to include both the U.S.-based and African populations of the Three

---

[1] A copy of the Budget Rider as enacted by Congress and signed by the President is included in the Statutory Addendum to this brief.

Antelope Species on the endangered species list. In *Friends of Animals v. Ashe*, 1:13-cv-01580 (D.D.C. 2013), which is currently pending in the district court, FoA alleges that FWS has continued the permitting practice found to be illegal under Section 10 by Judge Kennedy by repeatedly issuing Section 10 permits to hunting ranches that fail to meet the ESA's conservation requirements. The Budget Rider seeks to reverse Judge Kennedy's legal interpretation and dictate to the courts an outcome (mootness) in both pending cases.

Section 127 cannot survive constitutional scrutiny under *Plaut v. Spendthrift Farms*, 514 U.S. 211 (1994) or *United States v. Klein*, 80 U.S. 128 (1871). These cases recognize that while Congress has constitutional authority to make **<u>prospective changes in the law</u>** to overrule judicial decisions or alter ongoing litigation, Congress is not vested with authority to either issue a corrective judgment or merely direct the outcome of a case properly before an Article III court. Here, Congress did not amend the ESA, devise any new legal principles regarding either the listing or permitting processes under the Act, or in any way alter even a single substantive or procedural requirement applicable to the issuance of Section 10 permits. Simply put, the Budget Rider is a legislative effort to allow a particular group of people—hunting ranch operators that raise captive African antelope—to evade the authority of the judicial branch.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and the U.S. Const. art. III, §2. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order of the United States District Court for the District of Columbia. FoA appeals Honorable Judge Beryl A. Howell's Order and Memorandum

4

Opinion Granting the Federal Government's Motion for Summary Judgment and Denying FoA's Motion for Summary Judgment, Civ. No. 14-00357 (D.D.C. March 4, 2015), which constitutes a final order that disposed of all claims. FoA filed a notice of appeal on March 10, 2015, within sixty days of the district court's decision. Fed. R. App. P. 4(a)(1)(B).

## ISSUES FOR REVIEW

1.  Whether Friends of Animals has standing to pursue its claim that Title I, Section 127 of the consolidated Appropriations Act, 2014, violates the United States Constitution?

2.  Whether Title I, Section 127 of the consolidated Appropriations Act, 2014, violates the United States Constitution?

3.  Whether the United States Secretary of Interior and the United States Fish and Wildlife Service's reinstatement of the "Regulation that Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle Certain Prohibitions" was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Endangered Species Act?

///

///

///

**LEGAL AND FACTUAL BACKGROUND**

A.     **The Endangered Species Act.**

    1.     **The ESA places a high priority on non-native species.**

In passing the ESA, Congress created a national priority to protect species and the ecosystems in which they reside. *See generally* 16 U.S.C. § 1531. This priority extends to both native and non-native species. According to FWS:

> Interest in conserving species in danger of extinction got national attention in 1966 when Congress passed the Endangered Species Preservation Act [P.L. 89-669]. Globally, the issue generated action in 1969, when Congress passed the Endangered Species Conservation Act [P.L. 91-135], which recognized that fish and wildlife and plants know no jurisdictional boundaries and that conservation is a global issue. In an international approach, the Act called for a meeting of countries to plan a strategy to prevent extinctions—an event that took place in 1973, when 80 nations gathered in Washington, D.C., demonstrating the scope of the concern. Months later, on December 28, 1973, President Nixon signed into law the Endangered Species Act of 1973.

FWS, Foreign Species Fact Sheet (April 2011), *available at* http://www.fws.gov/endangered/esa-library/pdf/foreign_species.pdf (last visited August 6, 2015).

Today, approximately one-third of all species listed under the ESA are non-native to the United States. *See id.* Like with the Three Antelope Species at issue here, FWS has found that to protect non-native species from extinction in their home ranges, it is necessary to protect both captive and wild populations of endangered animals. Specifically, FWS has found that the ESA does not allow for captive animals to be assigned separate legal status from

their wild counterparts. 78 Fed. Reg. 33793 (June 5, 2013); *see also* 78 Fed. Reg. 35201 (June 12, 2013). Separate legal status is inconsistent with Section 2(b) of the ESA and could "increase trade in 'laundered' wild caught specimens to feed U.S. or foreign market demand . . .." 78 Fed. Reg. 33793.

### 2.     The "take" prohibition and Section 10 permits.

The fundamental method by which the ESA protects endangered species is its aggressive "take" prohibition. 16 U.S.C. § 1538. Defined broadly, the term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Section 9 also makes it illegal for any person to "import," "export," or "possess, sell, deliver, carry, transport or ship in interstate or foreign commerce . . . in the course of a commercial activity" an endangered species. *Id.* § 1538(a)(1). Section 9 protections apply equally to captive and wild endangered animals. 50 C.F.R. § 10.12; H.R. Rep. No. 93-412, at 10 (1973); *Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125, 129-30 (D.D.C. 1979).

Section 10 of the ESA provides FWS with some flexibility to grant limited exceptions to Section 9's prohibitions. 16 U.S.C § 1539. Congress recognized that it might be necessary to take actions that would otherwise violate Section 9 in order to aid in the recovery of species. Accordingly, Section 10(a)(1)(A) allows FWS to permit "any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species." *Id.* § 1539(a)(1)(A). FWS uses Section 10(a)(1)(A) to authorize captive breeding and reintroduction programs. For example, FWS has a permit allowing it to handle endangered Mexican wolves as part of an effort to reintroduce the species in the southwestern United States. 70 Fed. Reg. 71,554 (Nov. 29, 2005). Similarly, the National Marine Fisheries Service,

FWS's counterpart for marine species, issues permits for hatchery operations involving endangered salmon. 68 Fed. Reg. 1,826 (Jan. 14, 2003).

Under 50 C.F.R. § 13.21(b) (2011), an agency need not issue a permit if "[t]he applicant has failed to demonstrate a valid justification for the permit" or if "[t]he authorization requested potentially threatens a wildlife or plant population." *Conservation Force v. Salazar*, 2012 WL 1059732, *13 (D.D.C. Mar. 30, 2012). FWS is required to publish in the Federal Register notice of each application for a permit and invite the submission of comments on the application from interested parties. 16 U.S.C § 1539(c). FWS may only grant a permit under Section 10 of the ESA if the agency makes a finding that: (1) the permit was applied for in good faith; (2) if granted and exercised the permit will not operate to the disadvantage of such endangered species; and (3) that issuance of the permit will be consistent with the purposes and policy set forth in Section 2 of the ESA.[2] *Id.* at § 1539(d).

---

[2] Among other things, Section 2 states that it is the purpose of the ESA to provide a program for the conservation of endangered species. 16 U.S.C. § 1531. The term conservation is defined to mean:

> to use and the use of all methods and procedures which are necessary to bring endangered species and threatened species to the point at which measures provided [in the ESA] are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

**B.      The Three Antelope Species.**

The scimitar-horned oryx (*Oryx dammah*), dama gazelle (*Gazella dama*), and addax (*Addax nasomaculatus*) are all native to the Sahelo-Saharan regions of northern Africa. 70 Fed. Reg. 52319 (Sept. 2, 2015). The scimitar-horned oryx stands about 47 inches tall and weighs about 450 pounds with a generally pale coat and dark reddish brown neck and chest. *Id.*  Adult scimitar-horned oryx possess a pair of horns curving back in an arc up to 50 inches. *Id.*



**Scimitar-horned oryx (Wikimedia Commons Photo by Albinfo)**

///

///

///

The addax stands about 42 inches tall and weighs around 220 pounds with a grayish white coat and spiral horns that twist up to 43 inches long. 70 Fed. Reg. 52319.



**Addax (Wikimedia Commons Photo by Zachi Evenor).**

The dama gazelle, the largest of the gazelles and the smallest of the three antelope species at issue, was once common and widespread in arid and semi-arid regions of the Sahara. The dama gazelle is about 39 inches tall at the shoulder and weighs about 160 pounds with a mostly reddish brown body, but a white head, rump, and underparts. The dama gazelle's horns extend back and up, reaching a length of about 17 inches long.

///
///
///

10



**Dama Gazelle (Wikimedia Commons Photo by Mak Thorpe)**

All three antelope species are in danger of extinction throughout their ranges. 70 Fed. Reg. 52319. Although previously widespread in northern Africa, wild numbers of the three antelopes have declined drastically over the past 50 years as a result of habitat loss, poaching, civil wars, and the inadequacy of existing regulatory mechanisms. *Id.* at 52321-22. Estimated numbers of individuals in the wild are extremely low. *Id.* The scimitar-horned oryx, which once had an extensive range in North Africa, is believed to be extirpated in the wild. 78 Fed. Reg. 33791. The addax once existed throughout the deserts and sub-deserts of North Africa, from the Atlantic Ocean to the Nile River. 70 Fed. Reg. at 52319. Remnant populations of the addax may still exist in remote desert areas, but probably fewer than 300 occur in the wild. 78 Fed. Reg. 33791. The number of the dama gazelle in the wild is expected to be

11

less than 500. *Id.*

All three species are listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). *Id.* The International Union for Conservation of Nature ("IUCN") Red List categorizes the oryx as "extinct in the wild," and the dama gazelle and addax as "critically endangered." *Id.* Captive-bred scimitar-horned oryx and addax have been reintroduced to fenced areas in their native range in Morocco and Tunisia. Scimitar-horned oryx and dama gazelles have also been reintroduced to a fenced area in Senegal.[3] *Id.* The American Zoo and Aquarium Association works on research and reintroduction efforts involving the three antelope species through Species Survival Plans. 70 Fed. Reg. 5118. The scimitar-horned oryx, addax, and dama gazelle each have Species Survival Plans. *Id.* Many of these operations, including zoos, do not allow sport-hunting of the antelope. *See* Association of Zoos & Aquariums, Accreditation Standards and Related Policies 85 (2015) ("Animals must not be sent to organizations or individuals that allow the hunting of these individual animals; that is, no animal from an AZA institution may be hunted."), *available at* https://www.aza.org/uploadedFiles/Accreditation/AZA-Accreditation-Standards.pdf (last visited August 9, 2015).

## C.     Regulation of the Three Antelope Species.

The history of FWS's regulation of both U.S.-captive and overseas native scimitar-horned oryx, addax, and dama gazelle is set forth in *Safari Club Int'l v.*

---

[3] FoA participates in and provides funding for the recovery efforts in Senegal. App. at 079-82 (Declaration of Priscilla Feral In Support of Plaintiff's Motion for Summary Judgment ("Feral I Decl.") at ¶¶ 4-11).

*Jewell*, 960 F.Supp.2d 17 (D.D.C. 2013); *see also* App. at 016-019 (Complaint for Injunctive and Declaratory Relief at ¶¶ 39-61). By FoA's count, this is the fifth civil action brought against FWS challenging regulation (or failure to regulate) some aspect of these endangered species: *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009) (*Antelope I*); *Exotic Wildlife Association, et al. v. United States Department of the Interior, et al.,* Case No. 12-cv-00340 (D.D.C.) (*Antelope II);[4] Safari Club International v. Salazar, et al.*, Case No. 11-cv-01564 (D.D.C.) (*Antelope III*); *Friends of Animals v. Ashe et al.*, 1:13-cv-1580 (D.D.C.) (*Antelope IV*); and the case at bar (*Antelope V*). Two of these actions—*Antelope I and II* were resolved by the district court. *Antelope III* is currently on appeal to this Court and is being held in abeyance pending the outcome of this action (*Antelope V)*. Order Continuing Abeyance, *Safari Club Int'l v. Jewell*, No. 13-5300, Dkt. #1553996 (D.C. May 26, 2015).  *Antelope IV* is currently pending before the district and is also stayed pending resolution of this appeal. Order Continuing Stay, *Friends of Animals v. Ashe*, No. 13-CV-01580 (D.D.C. April 6, 2015).

The root of all of these cases was the listing of the Three Antelope Species on September 2, 2005, and the issuance of the Sport-Hunting Rule that very same day. 70 Fed. Reg. 52310. Under the Sport-Hunting Rule, any person can:

> Take; export or re-import; deliver, receive, carry, transport or
> ship in interstate or foreign commerce, in the course of a
> commercial activity; or sell or offer for sale in interstate or
> foreign commerce live wildlife . . . and sport-hunted trophies of

---

[4] *Antelope II* and *Antelope III* were consolidated in the District Court. *See* Memorandum Opinion and Order, 11-cv-01564 (ECF 30, March 16, 2012).

scimitar-horned   oryx   (Oryx   dammah),   addax   (Addax
nasomaculatus), and dama gazelle (Gazella dama).

50 C.F.R § 17.21(h). To qualify under the Sport-Hunting Rule, the activity

must have been associated with "the management or transfer of live wildlife . .

. or sport hunting in a manner that contributes to increasing or sustaining

captive numbers or to potential reintroduction to range countries." *Id.* The

rule required that a person claiming the benefit of the exception must

maintain accurate written records of activities, including births, deaths, and

transfers of specimens, and make those records accessible to FWS officials for

inspection. *Id.*

The Sport-Hunting Rule was challenged by Friends of Animals in

*Antelope I*, and on June 22, 2009, former District Court Judge Henry H.

Kennedy found the rule violated Section 10(c) of the ESA. Judge Kennedy said:

> By   assertedly   complying   with   subsection   10(c)   through
> publishing a proposed rule, accepting comment on that proposed
> rule,   and   providing   information   received   in   that   process   as
> opposed to through responding to an individual application, FWS
> abstracts the question of whether the exception will enhance the
> propagation   or   survival   of   the   species   from   the   specific   to   the
> general.   In   this   way,   FWS   avoids   providing   the   information   that
> would   necessarily   accompany   an   [individual]   application,   such   as
> "a   complete   description   and   address   of   the   institution   or   other
> facility   where   the   wildlife   sought   to   be   covered   by   the   permit   will
> be   used,   displayed,   or   maintained,"   and   "[a]   full   statement   of   the
> reasons   why   the   applicant   is   justified   in   obtaining   a   permit
> including   the   details   of   the   activities   sought   to   be   authorized   by
> the permit." **This hinders the ability of individuals and groups
> to participate in the meaningful way contemplated by the ESA
> because, without this information**, it is impossible to evaluate
> whether   each   permitted   act   will   enhance   the   propagation   or
> survival of the species.

*Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 118 (D.D.C. 2009)

(emphasis added).

Although it took nearly three years, in January 2012, FWS rescinded the Sport-Hunting Rule. 77 Fed. Reg. 431 (Jan. 5, 2012). In its place, FWS adopted a "fast track" approach to processing Section 10 applications from hunting ranches through the issuance of special guidelines, or as the agency called them—a "cheat sheet"—that caters to these ranchers. United States Department of the Interior, FWS, Application Guidelines for Conducting Interstate Commerce and Culling for the Three Antelope, available at http://www.fws.gov/international/pdf/factsheet-application-guidelines-for-interstate-commerce-and-culling-for-three-antelope.pdf (last visited August 6, 2015). Under this new approach, FWS has issued well over one hundred Section 10(a)(1) permits to hunting ranches in the United States that offer up one or more of the Three Antelope Species to trophy hunters willing to pay thousands of dollars for the kill. *See* Texas Hunt Lodge, Trophy Fees, *available from http://www.texashuntlodge.com/trophyfees.asp* (last visited August 9, 2015).

Shortly after rescinding the Sport-Hunting Rule, pro-hunting organizations petitioned FWS to remove U.S. captive populations of the Three Antelope Species from the federal list of endangered and threatened wildlife under the ESA. 78 Fed. Reg. 35201. FWS found that the petitions did not warrant delisting the captive-bred populations because treating captive populations differently would be inconsistent with the purpose of the ESA and could cause an increase in take and trade in laundered wild-caught animals. 78 Fed. Reg. 33790 (June 5, 2013). Pro-hunting organizations also filed suits— *Antelope II* and *Antelope III*—against FWS trying to prevent regulation of the Three Antelope Species on ranches in the United States. The Safari Club

International ("SCI"), a group that promotes unrestricted hunting of animals for sport, specifically states in its *Antelope III* complaint:

> This suit challenges the Federal Defendants' violations of the Endangered Species Act and the Administrative Procedures [sic] Act in their: (1) decision to include U.S. captive populations of the scimitar-horned oryx, dama gazelle and addex in the endangered species listing of the three antelope species on September 2, 2005; and (2) failure to correct that endangered species listing by removing the U.S. captive herds of the three species from endangered species status **after the 2009 ruling by Judge Kennedy of the U.S. District Court for the District of Columbia, which found illegal federal regulations exempting those captive populations from ESA protections.**

Complaint, 11-cv-01564 (D.D.C. Aug. 31, 2011), ECF 1 at ¶ 1 (emphasis added); *see also id.* at ¶ 9. On August 9, 2013, however, the district court upheld FWS's decision to treat captive and wild populations of the three antelope the same under the ESA. *Safari Club Int'l v. Jewell*, No. 11-CV-01564 (D.D.C. Aug. 9, 2013). But SCI persists, and the lower court's decision is now on appeal to this Court. Order Continuing Abeyance, *Safari Club Int'l v. Jewell*, No. 13-5300, Dkt. #1553996 (D.C. May 26, 2015).

Finally, on October 13, 2013, FoA brought suit against FWS challenging FWS's continued failure to comply with Section 10 when it comes to regulating captive members of the Three Antelope Species. Complaint, *Friends of Animals v. Ashe*, No. 13-CV-01580 (D.D.C. Oct. 16, 2013). In that suit (*Antelope IV*), FoA argues that FWS has failed to comply with Judge Kennedy's interpretation of the ESA by issuing permits that do not qualify for issuance under Section 10, and as a

16

result, continues to deny the public a meaningful opportunity to participate in the permitting process. *Id.* at ¶¶ 4, 106, 187.

**D.     The Special Interest Antelope Budget Rider.**

The 2014 omnibus spending bill was a hurriedly written and enacted bill in January 2014 intended to act as a temporary funding measure to keep the federal government operating for six months after Congress failed to pass any of the twelve regular budget proposals before the start of the 2014 fiscal year. *See* "Status of Appropriations Legislation for Fiscal Year 2014," Library of Congress, *available at* http://thomas.loc.gov/home/approp/app14.html (last visited Aug. 9, 2015). The bill was 1500 pages long, covering the entire federal budget. Wasson, Erik, "$1T Omnibus Spending Bill Unveiled," The Hill (Jan. 13, 2014), *available at* http://thehill.com/policy/finance/195318-lawmakers-unveil-1t-omnibus-spending-bill (last visited Aug. 9, 2015).

Among many of its provisions was a single sentence, Section 127, inserted into the bill by Representative John Carter that directs the Secretary of the Interior to republish the 2005 Sport-Hunting Rule within 60 days of enactment. Section 127 is titled the "Antelope Rule" and reads: "Before the end of the 60-day period beginning on the date of enactment of this Act, the Secretary of the Interior shall reissue the final rule published on September 2, 2005 (70 Fed. Reg. 52310 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule." Section 127 does not alter any statutory provision in the ESA. Indeed, Section 127 does not contain **<u>any</u>** substantive criteria for FWS to apply in issuing a Section 10 blanket permit for the take of the Three Antelope Species. President Obama signed the omnibus budget into law on January 18, 2014, the day after Congress passed it.

17

In passing the Consolidated Appropriations Act of 2014, neither house of Congress specifically addressed Section 127 during floor debate. The only mention of Section 127 in the Congressional record is found at 160 Cong. Rec. H475-01, a document entitled "EXPLANATORY STATEMENT SUBMITTED BY MR. ROGERS OF KENTUCKY, CHAIRMAN OF THE HOUSE COMMITTEE ON APPROPRIATIONS REGARDING THE HOUSE AMENDMENT TO THE SENATE AMENDMENT ON H.R. 3547, CONSOLIDATED APPROPRIATIONS ACT, 2014." Regarding Section 127, Mr. Rogers' explanatory statement provides only "Section 127 directs the Secretary of the Interior to reissue a rule pertaining to wildlife." *Id.* at H977. Outside of Mr. Rogers' explanatory statement, there is no legislative history regarding Section 127's purpose and intent. However, as Representative Carter states in a January 2012 press release:

> [I am] introducing legislation to restore the original USFWS ruling that allows hunting preserves to stock, breed, hunt, and preserve the species, under which the antelope were saved from extinction over past decades. Lawsuits by extremist animal rights groups led to the agency's revocation of those rules. As a result, game ranchers will be economically forced to cull their herds of African antelope by April [2012] unless the rules are changed.

*See* Congressman John Carter, Carter Fights to Block Potential Mass Killing of Endangered African Antelope (2012), available from

*http://carter.house.gov/press-releases/carter-fights-to-block-potential-mass-killing-of-endangered-african-antelope/* (last visited August 9, 2015).

### E.    FWS's Republishing Of The Illegal Sport-Hunting Rule.

On March 19, 2014, FWS issued the final rule: Reinstatement of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and

18

Dama Gazelle From Certain Prohibitions. 79 Fed. Reg. 15250; 50 C.F.R. §
17.21. In reissuing the Rule, Federal Defendants did not comply with the
various statutory, Executive Order, and Department Manual requirements
applicable to rulemaking. In reissuing the Rule, Federal Defendants did not
make any additional or new substantive findings regarding justification for
the rule.

## STATEMENT OF THE CASE

FoA filed this suit in the U.S. District Court for the District of Columbia
on March 5, 2014. App. at 002. FoA challenges Section 127's enactment by
Congress as a violation of the Constitution's Separation of Powers Doctrine.
FoA also sought judicial review of the Federal Defendants' republication of the
Sport-Hunting Rule, seeking to have the rule set aside by the district court as a
violation of Section 10 of the ESA. The Safari Club International, a proponent
of Section 127, intervened in the district court proceedings under Federal
Rule of Civil Procedure 24(a).

The case below was heard on cross-motions for summary judgment.
The district court, on March 3, 2015, issued a Memorandum Opinion granting
the Federal Defendants' Motion for Summary Judgment and denying FoA's
Motion for Summary Judgment. App. at 229-49. The district court ruled that
FoA had Article III standing to seek judicial review of the Federal Defendants'
republished Sport-Hunting Rule, but found the rule to be neither arbitrary nor
capricious. The district court also found that FoA did not have Article III
standing to challenge the constitutionality of Section 127. However, the court
did rule that even if FoA has standing, that Section 127 was not
unconstitutional. FoA timely sought review in this Court.

## SUMMARY OF ARGUMENT

The district court erred in finding that FoA lacked standing to challenge Congress's passage of the Budget Rider that removed ESA protections for captive-bred members of the Three Antelope Species. Notably, the district court agreed with FoA that Section 10(c) of the ESA creates a concrete right to particular information regarding the lawful, permitted take of captive antelope on U.S. hunting ranches. App. at 237-39 (Memorandum Order, *Friends of Animals v. Jewell*, Civ. No. 14-00357 *9-11 (D.D.C. March 4, 2015)). The district court, however, concluded that FoA's "constitutional challenge" of the Budget Rider does not implicate its Section 10 informational rights. App. at 239.

Nothing could be further from the truth. Before the Budget Rider was enacted, more than a hundred hunting ranches had applied for and obtained Section 10 permits. FoA participated in many of these permitting actions by requesting information and submitting comments, the precise public participation Congress envisioned under Section 10. Section 127 was, of course, intended to exempt hunting ranches that offer the Three Antelope Species up for trophies from Section 10, and, thus, directly thwarts FOA's right to information and right to participate in the regulation of these captive, but otherwise endangered, animals. Accordingly, the district court's conclusion that FoA failed to "allege that the challenged action violates the source of [its] information rights" is in error. App. at 239.

Because the district court found FoA lacked standing to challenge the constitutionality of the Budget Rider, it did not fully adjudicate this claim. Instead, in a footnote, the district court generally noted that such challenges are rarely successful, that the rider appears "analogous" to others that have

been upheld as constitutional, and that the rider was not aimed at disturbing a case that was already adjudicated. App. at 248, n.9. These unsupported conclusions cannot be upheld.

In enacting the Budget Rider, Congress stepped on the province of the judiciary in two fundamental ways. First, Section 127 does nothing more then "reverse a determination once made, in a particular case," for the benefit of a particular set of private parties—namely the owners of hunting ranches that offer captive African antelope as trophies. *See* The Federalist No. 81, p. 545. These ranchers have participated in the decade long litigation regarding their rights under the ESA, and such rights pertaining to the permitting of lawful take on their ranches was specifically adjudicated by Judge Kennedy in *Antelope I*.[5] The Budget Rider impermissibly alters their adjudicated rights, reliving them of the duty to comply with Section 10.

Second, the Budget Rider impermissibly directs the judiciary as to its construction of law in two pending cases **without prescribing any change to the underlying, applicable law**. The Budget Rider is clearly distinguishable from the "analogous" cases looked at by the district court, all of which were found to alter the substantive law, even if only slightly.

Section 127 is precisely the type of a "special bill" that had so offended the Framers. Indeed, one or two members of the legislature that simply disagreed with the way things had been going in court for their constituents, sought to effectively nullify the judiciary's role in the Section 10 permitting process. In doing so, they have redefined the rights of two sets of private individuals: those that were obligated to obtain permits under Section 10

---

[5] The ranchers' interests were represented by the Safari Club International, which intervened in *Antelope I* on their behalf.

21

before taking any of the listed antelope, **__and__** those that had a right to obtain certain information about such an authorized take. In short, Section 127 seeks to place a particular private, for-profit interest above all other private and public interests protected by the ESA.

Finally, even if constitutional, Section 127 does not preclude judicial review and does not limit the courts from reviewing whether the reissued Sport-Hunting Rule is contrary to the requirements of Section 10 of the ESA. The Budget Rider is plainly directed only at the Secretary of Interior and provides no new direction to the judiciary. Accordingly, the reissued Sport-Hunting Rule should be set aside under the APA as contrary to law, as it fails to require each captive breeding operation to obtain an individual permit and fails to make individual hunting ranch permit applications available to the public for review and comment.

**STANDARD OF REVIEW**

Review of the district court's decision on standing is *de novo*. *Safari Club Int'l v. Salazar (In re Endangered Species Act Section 4 Deadline Litig.)*, 704 F.3d 972, 976 (D.C. 2013). Likewise, the district court's granting of summary judgment is reviewed *de novo*. *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992); *Branch Ministries v. Rossotti,* 341 U.S. App. D.C. 166, 211 F.3d 137, 141 (2000) (summary judgement on constitutional claims reviewed de novo); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. 1996) (review of district courts summary judgement decision on claims arising under the [Administrative Procedure Act] is "de novo without deference to the district court's determinations.").

Thus, this Court must first determine if FoA has standing to challenge the constitutionality of the Budget Rider. If FoA does have standing, the Court

22

must then determine whether Congress violated the Constitution's Separation of Powers doctrine in enacting Section 127. If Section 127 is unconstitutional, that is the end of the matter. If Section 127 does manage to pass constitutional muster, then the Court must decide if Section 127 is reviewable under the Administrative Procedure Act ("APA"). If it is, then the last question for the Court is whether the Federal Defendants' reissuing the Sport-Hunting Rule was either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir.1999).

## ARGUMENT

**A.     Standing: Congress's Inclusion of Section 127 in the 2014 Federal Budget Caused FoA and Its Members to Suffer Information Injury Which Could Be Redressed By The Court If Section 127 Is Found Unconstitutional.**

Article III of the United States Constitution restricts judicial power to cases or controversies. Thus, to establish standing to bring a case in an Article III court, a plaintiff must establish that: (1) it has suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the favorable judicial decision will prevent or redress the injury. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An organization has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id*, at 173.

23

A deprivation of information can constitute injury in fact sufficient to establish standing. *See FEC v. Akins,* 524 U.S. 11, 21 (1998). To establish informational standing, a plaintiff must: (1) identify a law that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, and (2) show that it has been denied the information to which it is entitled. *Id.* More recently, courts, including this one, have suggested a third aspect of the test—that there is no reason to doubt plaintiff's claim that the information would help it. *ASPCA v. Feld Entm't, Inc.,* 659 F.3d 13, 22–23 (D.C. Cir. 2011); *Foundation on Economic Trends v. Lying*, 943 F.2d 79, 85 (D.C. Cir. 1991); *Am. Canoe Ass'n v. City of Louisa Water Treatment Plant*, 389 F.3d 536, 546 (6th Cir. 2004). Here, FoA satisfies all three prongs, both as an organization and on behalf of its members because FoA and its members have been denied information they otherwise have a right to absent the Budget Rider.

1.     **Under FoA's reading, Section 10 of the ESA requires the Secretary to disclose information about the legalized, permitted take of captive members of the Three Antelope Species.**

The district court agreed that FoA has a statutory right to information about individual canned-hunting ranches under Section 10(c). *Friends of Animals v. Jewell*, Civ. No. 14-00357 *9-11 (D.D.C. March 4, 2015). Section 10(c) requires FWS to publish in the Federal Register "**each** application for an exemption or permit." 16 U.S.C. § 1539(c) (emphasis added). In addition, FWS must ask for public comments and make available to the public all information received as part of each application. *Id.* Under Section 10(d), FWS must publish a finding in the Federal Register that the application: (1) was applied for in good faith, (2) will not operate to the disadvantage of the endangered

24

species, and (3) is consistent with the purposes and policies of the ESA. *Id.* § 1539(d). These public participation requirements are mandatory. *Gerber v. Norton*, 294 F.3d 173, 185-86 (D.C. Cir. 2002).

### 2. Through enactment of Section 127, Congress denied FoA information it otherwise has a statutory right to obtain.

It can hardly be disputed that the Budget Rider, directing the Secretary to reissue the illegal Sport-Hunting Rule, eliminates the procedural requirements for individual canned hunting facilities **and** the ability of FoA to obtain information about the permitting of take of the Three Antelope Species on these ranches. There is no application process or even a requirement to notify FWS if a facility is operating under the rule. 50 C.F.R. § 17.21(h). Rather, canned hunting facilities can continue with business as usual, and it is up to FWS to inspect facilities and determine if they are not meeting the limited requirements of the rule. *Id*. As a result, the rule shuts the public out of the process completely.[6]

The district court's use of *Feld* as a means to disconnect FoA's constitutional challenge of the Special Rider from its informational injury under Section 10 is misplaced. *Feld* is an action brought by animal advocacy organizations, including Animal Protection Institute ("API"), pursuant to the

---

[6] Not only does the rule eliminate the public process under Section 10(c), it also eliminates the public's ability to get this information through other means. Although the rule requires canned hunting facilities to maintain records, they are kept at the ranches and never submitted to FWS. As a result, the public cannot even obtain the records under the Freedom of Information Act ("FOIA") because the Act applies only to records held by an agency. 5 U.S.C. § 552(a)(3)(A), (f).

citizen suit provision of the ESA against Ringling Brothers and Barnum & Bailey Circus alleging that certain instruments (bullhooks and tethers) purposefully used on circus elephants constituted a "take" under Section 9 of the Act. After finding that Plaintiffs' primary standing witness had been improperly paid to testify, the lower court concluded that the plaintiffs lacked informational standing to pursue a citizen suit because: "(1) the statutory basis for API's suit, ESA section 9, imposes no duty on Feld to provide information; (2) even if Feld's practices were deemed a "taking," Feld might decide not to seek a permit, and if it did, the flow of information to API would be controlled by the agency, not Feld; and (3) API already had all of the information it would obtain through the permit process." *Feld Entm't, Inc.*, 659 F.3d at 19. This Court, on review, upheld the lower court, essentially finding that the possibility that plaintiff's success on the merits of its Section 9 suit would trigger a right to information under Section 10 was too attenuated:

> If API is correct about section 9—that Feld's use of bullhooks and chains constitutes a prohibited take—then Feld would be obligated to cease those practices, but nothing in section 9, even under API's view, would entitle plaintiffs to any information. True, if Feld wished to recommence the use of bullhooks and chains, it would have to seek a section 10 permit from the Fish and Wildlife Service, and section 10(c) would then entitle API to obtain the information received by the Service as part of Feld's permit application. [ ] If at that point Feld refused to disclose information in its permit application that API believed the statute required, or if the Fish and Wildlife Service refused to make public the information it received, then API might have informational standing to bring suit for violations of section 10. But here API seeks only to enforce section 9; indeed, a suit under section 10 would be entirely premature.

*Id.* at 24-25 (citations omitted).

In contrast, this appeal directly implicates Section 10's disclosure requirements, which as this Court has noted are triggered in the context of permit proceedings and are "intended, not to provide a broad right to information about the activities of any person engaged in a taking, but to allow interested parties to comment on and assist the Secretary's evaluation of permit applications." *ASPCA v. Feld Entm't. Inc.*, 659 F.3d at 23-24; *see also* 16 U.S.C. § 1539(c) (requiring the Secretary to "invite the submission from interested parties . . . of written data, views, or arguments with respect to the [permit] application"). As noted, after withdraw of the Sport-Hunting Rule in 2012, FWS developed a special program for processing Section 10 permits to authorize the take of the Three Antelope Species on U.S. ranches. Before the Special Rider was enacted, FWS had processed and issued over 100 such permits, at least a quarter of which FoA sought to directly participate. *See e.g.* 78 Fed. Reg. 30325, Receipt of Applications for Permit (May 22, 2103); 78 Fed. Reg. 56922, Notice of Issuance of Permits (Sept. 16, 2013); App. at 089-090 (Feral Decl. I at ¶ 34). At the time Section 127 was signed by the President, FoA was in the process of actively challenging the special permitting program as a whole, as well as three specific permits.[7] App. at 089-090 (Feral Decl. I at ¶ 34). Chief among FoA's concern in the *Antelope IV* case is that in issuing permits to individual ranches, FWS was not requiring the permit applicants to

---

[7] Moreover, there were permit applications still pending before FWS when the 2014 federal budget was signed by President Obama. *See e.g.* 79 Fed. Reg. 4171 (Jan. 24, 2014) (notice of application to kill scimitar-horned oryx from captive hunting facility in Texas). Section 127 effectively eliminated the right of FoA to information under Section 10(c) as to those pending applications.

comply with Section 10 and was continuing to deprive FoA information essential to its participation. In short, the Budget Rider is the direct cause for the information injury suffered by FoA in that Section 127 stole away FoA's informational rights under Section 10(c) with regard to the legal take being permitted by FWS of the Three Antelope Species.

### 3. Section 127 deprives FoA of information that would have been helpful in its ongoing work to protect African antelope.

Many cases have indicated that all that is needed to establish standing is the deprivation of information that one was entitled to receive.[8] However, in *Foundation on Economic Trends v. Lyng*, this Court expressed concern that the withholding of information **alone** may not be sufficient injury in fact to satisfy the plaintiff's burden to demonstrate Article III standing. 943 F.2d 79, 85 (D.C.

---

[8] *See e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989) (finding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-374 (1982) (holding that the deprivation of information about housing availability constitutes "specific injury" permitting standing); *Judicial Watch v. United States DOC*, 583 F.3d 871, 873 (D.C. Cir. 2009) (holding that agency's failure to disclose information that the was required under plaintiffs reading of the Federal Advisory Committee Act constituted a sufficient injury to establish standing; *see also Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008) (finding that plaintiff's "injury in fact is the denial of information he believes the law entitles him to"); *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006) (explaining that where Congress creates a statutory right to information, "[a]nyone whose request for specific information has been denied has standing to bring an action; the requester's circumstances - why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose - are irrelevant to his standing").

Cir. 1991). In *Lyng*, the Court seemed concerned about how standing based on deprivation of information alone reconciled with the requirement that injury be concrete and particularized. *Id.* at 84-86. While *Lyng* never resolved this concern, at least one Circuit has expressly addressed it.

In *American Canoe Association v. City of Louisa Water Treatment Plant*, the Sixth Circuit recognized that the Supreme Court's opinions on informational standing—*FEC v. Akins*, 524 U.S. 11 (1998) and *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440 (1989)—seem to be "at odds" with each other on this question. 389 F.3d 536, 545 (6th Cir. 2004). On one hand, the Sixth Circuit reads *Public Citizen* to hold that under the Freedom of Information Act and the Federal Advisory Committee Act all that is necessary to demonstrate standing is the withholding of information that plaintiff has a legal right to. *Id*. On the other hand, *American Canoe* recognizes that in *Akins* the Supreme Court seems to require "some additional 'plus,'" that is, some reason that the plaintiff needs the information. *Id*. at 455-46; *but see* Cass R. Sunstein, *Informational Regulation and Informational Standing: Akins and Beyond*, 147 U. Pa. L. Rev. 613, 643 n. 154 (1999) ("All that is clear is that after *Akins* a deprivation of information consists of injury in fact if Congress has said so"). While the issue is not fully resolved, the court in *American Canoe* ultimately found that to the extent some additional "plus" is required, the requirement should be liberally construed. *Id*. at 456. Thus, it was enough in that case, that the plaintiffs could show that the Secretary's withholding of the information "negatively affected" their "interests." *Id*. The same is true here.

FoA's and its members suffer because of their inability to get this information. FoA actively participates in domestic and international conservation programs for all three African Antelope Species. App. at 079-82,

29

86-89 (Feral Decl. I ¶¶ 3-11, 24-32). More importantly, FoA is active in promoting conservation of these species through its public outreach and educational activities. App. at 086-93 (Feral Decl. I ¶¶ 24-32, 35-41). FoA utilizes several tools to get information to its members and the public, including a quarterly magazine, its website, social media, press releases, blog, and newspaper and journal publications. *Id.* Part of FoA's mission is to keep its members and the public fully informed about efforts to conserve species. App. at 078, 086-89 (Feral Decl. I ¶¶ 2, 24, 28-30, 35). The Budget Rider and the re-issued Sport-Hunting Rule stymies the organization's ability to disseminate to its members and the public accurate and up-to-date scientific information about the status of these species. App. at 089-95 (Feral Decl. I ¶¶ 33-46); *see, e.g.*, *American Canoe*, 389 F.3d at 346 (finding that plaintiffs had sufficiently demonstrated injury in showing that the defendants' failure to provide the statutorily required information stymied the organizational plaintiffs' ability to honor their own reporting and monitoring obligations to their members).

Similarly, FoA can no longer attempt to persuade FWS not to allow canned hunting of the Three Antelope Species through the permitting process. App. at 089-90 (Feral Decl. I ¶¶ 33-35). Nor can FoA use the information to try and influence legislation and administrative policy. *Id.* Finally, FoA can no longer use this information to challenge individual permitting decisions in the courts. *Id.*

Accordingly, FoA has suffered informational injury as a result of the challenged regulation. This injury would be redressed by this Court if it declared the Budget Rider **or** subsequently issued Sport-Hunting Rule unlawful.

30

**B.     Constitutional Arguments: The Budget Rider Infringes on the Judicial Power of Article III Courts In Violation of the Separation of Powers Doctrine.**

**1.      The Separation of Powers Doctrine.**

Separation of powers is an "essential precaution in favor of liberty," (The Federalist No. 47, at 323 (J. Cooke ed. 1961)), and it is part of "our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government" (*United States v. United States District Court*, 407 U.S. 297, 317 (1972)). As the Supreme Court carefully described the doctrine two decades ago in *Plaut v. Spendthrift Farm*:

> The Framers of our Constitution lived among the ruins of a system if intermingled legislative and judicial powers, which had been prevalent in the colonies long before the Revolution, and which after the Revolution had produced fractional strife and partisan oppression. In the 17th and 18th centuries colonial assemblies and legislatures functioned as courts of equity of last resort, hearing original actions or providing appellate review of judicial judgments. Often, however, they chose to correct the judicial process through special bills or other enacted legislation. . . . [Indeed, a] principal method of usurpation [by the legislature] was 'the instances . . . of judgments being vacated by legislative acts.'

514 U.S. 211, 219-220 (1994)(citations omitted).

Justice Scalia continued with his lesson on the Constitution's separation of powers doctrine in *Plaut* by explaining that state legislatures after the Revolution had "made it a custom of 'extending their deliberations to the cases of individuals,'" and that "the people had 'been taught to consider an application to the legislature, as a shorter and more certain mode of obtaining relief from hardships and losses, than the usual process of law.'" *Id.* at 221.

31

Thus, on the eve of the Constitutional Convention, there was a "sense of a sharp necessity to separate the legislative from the judicial power." *Id*. This sense was summed-up by Hamilton in his "exegesis" of Article III, Section 1 in Federalist No. 81:

> It is not true . . . that the parliament of Great Britain, or the legislatures of the particular states, can rectify the exceptionable decisions of their respective courts, in any other sense than might be done by a future legislature of the United States. The theory neither of the British, nor the state constitutions, authorizes the reversal of a judicial sentence, by a legislative act. . . . A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases.

*Id*. at 222 (*citing* The Federalist No. 81, p. 545 (J. Cooke ed. 1961)).

In short, the "essential balance" created in Article III, Section 1 is that the "legislature is possessed of power to 'prescribe the rules by which the duties and rights of every citizen are to be regulated' but the power of 'the interpretation of the laws' would be 'the proper and peculiar province of the courts.'" *Id*. (*citing* The Federalist No. 78, p. 523, 525 (J. Cooke ed. 1961); *Wayman v. Southard*, 23 U.S. 1 (1825)( "[t]he difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law."; *see also Marbury v. Madison*, 5 U.S. 137 (1803) (establishing authority of judicial branch, including authority to order executive to comply with law and to overrule acts of Congress).

## 2.    Section 127 is unconstitutional under *Plaut*.

At the heart of the Supreme Court's decision in *Plaut* is the principle that Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to **decide** them, subject to review only by superior courts in the Article III

hierarchy." *Plaut*, 514 U.S. at 218-219 (emphasis added); *see also Miller v. French*, 530 U.S. 327, 342 (2000). When legislation is applied to undo a final judgment of an Article III court, it simply offends the Constitution and cannot stand. *Plaut*, 514 U.S. 224-225. Here, the Sport-Hunting Rule was promulgated by FWS in 2005 under the guise of Section 10 as it read at the time (and, notably still reads). Upon review by a court of proper jurisdiction, it was deemed that the rule violated Section 10. Section 127 seeks to change that outcome without changing the underlying legal defects. Congress has told the agency to take the 2005 rule and republish it **as if the court had never deemed it unlawful**. The Budget Rider simply reverses Judge Kennedy's final judgment in *Antelope I* and must be found unconstitutional. *See, e. g., Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113 (1948)("Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government"); *United States v. O'Grady,* 89 U.S. 641, 647-648 (1875) ("Judicial jurisdiction implies the power to hear and determine a cause, and . . . Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal); *Gordon* v. *United States*, 117 U.S. Appx. 697, 700-704 (1864) (opinion of Taney, C. J.) (judgments of Article III courts are "final and conclusive upon the rights of the parties"); *Hayburn's Case*, 2 U.S. 409, 411 (1792) (opinion of Wilson and Blair, JJ., and Peters, D. J.) ("Revision and control" of Article III judgments is "radically inconsistent with the independence of that judicial power which is vested in the courts"); *id., at 413* (opinion of Iredell, J., and Sitgreaves, D. J.) ("No decision of any court of the United States can, under any circumstances, .

33

. . be liable to a revision, or even suspension, by the legislature itself, in whom no judicial power of any kind appears to be vested").

Of course, the Federal Defendants argue that Section 127 does not run afoul of *Plaut* because Congress did not intend Section 127 to have retroactive effect, but only guide the prospective "republishing" and implementation of the rule. But this makes a mockery of the Separation of Powers principles that *Plaut* so carefully seeks to preserve. Obviously, all "retroactive" legislation will also have a "prospective" effect. Likewise, it is not possible for the Secretary of Interior to literally go back in time to republish the rule; that administrative act must take place prospectively. Neither of these facts are dispositive, however. Under *Pluat*, a **final** judicial decision "becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable **to that very case** was something other than what the courts said it was." 514 U.S. at 227.

Here, the very case that was resolved was the legality of the 2005 Sport-Hunting Rule, and in doing so, Judge Kennedy determined rights under Section 10 of the ESA. Section 127 purports to alter rights under the ESA **for an entire class of individuals**, rights that were fully adjudicated and subject to a final decision in *Antelope I*. This is not a situation where Congress changed the law as it might apply generally in the future, or even to a different class of individuals. We are talking about a single group of people—a few hundred hunting ranch operators. *Antelope I* decided the rights, be they public or private rights, under Section 10 of the ESA for those individuals. Again, Congress did not amend, alter or otherwise change Section 10; it merely

unconstitutionally vacated a final determination of an Article III court regarding those rights.

In short, Congress cannot simply tell the Secretary to ignore this final judgment and republish the very same rule. Now that is not to say that if unhappy with the result in *Antelope I*, Congress could not chose to amend Section 10 to allow for the promulgation of a new rule that might allow for a broad take exemption for hunting ranches. While this distinction might appear to be a fine one, it is the Constitutional line. *Plaut*, 514 U.S. at 228 ("The separation of powers violation . . . consists of depriving judicial judgments of the conclusive effect that they had when they were announced, not of acting in a manner—*viz.*, with a particular rather than general effect—that is unusual (though, we must note, not impossible) for a legislature."). In short, the Budget Rider at issue does nothing more than "purport to revive a dead claim" regarding the rights under an unaltered Section 10. *See Mount Graham Coalition v. Thomas,* 89 F.3d 554, 557 (9th Cir. 1996).

### 3.    Section 127 is unconstitutional under *Klein*.

Section 127 also unconstitutionally interferes in two pending cases before Article III courts, seeking to direct the outcomes in those cases by ensuring that they are deemed moot. Two early decisions of the Supreme Court address the limits Article III imposes on Congress's ability to direct a court's interpretation and application of the law to the facts in particular pending cases. In *State of Pennsylvania v. The Wheeling and Belmont Bridge Company*, 59 U.S. 421 (1855), the Supreme Court had previously ruled two bridges over the Ohio River were an obstruction to navigation under existing law that regulated navigation. *Id.* at 429. Subsequently, Congress enacted a new law designating the bridges "post-roads for the passage of the mails of

35

the United States" and authorized the Wheeling and Belmont Bridge Company
"to have and maintain their said bridges at their present site and elevation."
*Id.* The Supreme Court held that the new law making the bridges post roads
changed the substantive law governing interstate commerce and the bridges.
*Id.* at 30. Under the new law, the Court's prior ruling regarding the bridges no
longer applied:

> So far, therefore, as this bridge created an obstruction to the
> free navigation of the river, in view of the previous acts of
> congress, they are to be regarded as modified by this
> subsequent legislation; and although [the bridge] still may be
> an obstruction in fact, [it] is not so in the contemplation of the
> law.

*Id.*

A few years later, in *United States v. Klein*, 80 U.S. 128 (1871), Congress,
unhappy with the Supreme Court's decision that the proof of loyalty to the
Union necessary to entitle a confederate the return of his property could be
shown by receipt of a Presidential pardon, added this little amendment, "with
perhaps little consideration in either House of Congress," *Klein*, 80 U.S. at 143,
to an appropriations act:

> The substance of this enactment is that an acceptance of a
> pardon, without disclaimer, shall be conclusive evidence of the
> acts pardoned, but shall be null and void as evidence of the
> rights conferred by it, both in the Court of Claims and in this
> court on appeal.

*Id.* at 144.

The Supreme Court found this new law unconstitutional because in it
"Congress … inadvertently passed the limit which separates the legislative

from the judicial power." *Id.* at 147. In reaching this conclusion, the Supreme Court carefully distinguished *Wheeling Bridge*:

> No arbitrary rule of decision was prescribed in [*Wheeling Bridge*], but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us **no new circumstances have** **been created by legislation**. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary.

*Klein*, 80 U.S. at 146-47 (emphasis added). *Klein* and *Wheeling Bridge* thus stand for the proposition that Congress cannot direct the outcome of a particular pending case by instructing the courts how to interpret and apply the existing law to the specific pending claims. *See also Plaut,* 514 U.S. at 218 ("Whatever the precise scope of *Klein . . .* later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'").

The Supreme Court returned to its analysis of *Klein* over a century later in *Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992). *Robertson* arose when, in response to successful litigation brought by conservation groups halting proposed logging in certain National Forests, Congress enacted the "Northwest Timber Compromise" as § 318 of the Department of the Interior and Related Agencies appropriations Act of 1990, 103 Stat. 745. 503 U.S. at 433. Subsection 318(b)(6)(A) of this Act provided:

> [T]he Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated

37

> cases captioned [identifying the conservations groups' litigation
> by case name and docket number].

*See Robertson*, 503 U.S. at 434-35.

In upholding this legislation, the Supreme Court found that "subsection (b)(6)(A) compelled changes in law, not findings or results under old law" because "under subsection(b)(6)(A), the agencies could satisfy their MBTA [Migratory Bird Treaty Act] obligations in either of two ways: by managing their lands so as neither to 'kill' nor 'take' any northern spotted owl within the meaning of § 2 [of the MBTA, 16 U.S.C. § 703], or by managing their lands so as not to violate the prohibitions of subsections (b)(3) and (b)(5) [of Section 318 of the Appropriations Act]." *Id.* at 438. The Supreme Court based this determination, not on any contrary interpretation of *Klein*, but on the grounds that the challenged appropriations act had actually amended the applicable underlying statute and, thus, passed constitutional scrutiny. Indeed, the Supreme Court has subsequently noted that the key in determining the constitutionality of a congressional act under *Klein* is whether the new law violates the Constitution by "prescribe[ing] a rule of decision" or instead creates "a new legal standard." *French*, 530 U.S. at 349; *see also Estate of Charlot v. Bushmaster Firearms, Inc.*, 628 F. Supp. 2d 174, 183 (D.D.C. 2009)(same); *Grey v. First Winthrop Corp.* 989 F.2d 1564, 1569-70 (9th Cir. 1993)(*Robertson* indicates a high degree of judicial tolerance for an act of Congress that is intended to affect litigation **so long as it changes the underlying substantive law in any detectable way**.") (emphasis added).

In short, in all previous Supreme Court cases in which the congressional act was upheld, there was some change in the law that the Court could identify, *i.e.*, the change in the legal status of the bridges in *Wheeling,* the

38

addition of an alternative means to comply with the MBTA in *Robertson*, and the addition of substantive new standards to guide the issuance of judicial stays under the Prison Litigation Reform Act in *French*. But here, Section 127 makes no change, not even the most minor addition or subtraction, to the ESA or to the legal status of the Three Antelope Species under the ESA. The requirements in Section 4 for listing species, the take prohibitions of Section 9, and the requirements in Section 10 that must be met to obtain a limited exemption from the take prohibition remain **exactly as they were** before Section 127 was enacted. Moreover, the Three Antelope Species remain legally endangered. The only thing that was altered was the opinion of Judge Kennedy, which for reasons stated above such altercation was itself unconstitutional. In turn, Congress's failure to create a "new legal standard," and instead simply proscribe a rule of decision (mootness) to two pending cases, is equally unconstitutional.

>   a.   *The "without regard to any other provision of law" line of cases does not change the fact that Section 127 is unconstitutional.*

In the district court the government and intervenor pointed to a number of cases from the Ninth Circuit in which Congress passed provisions intended to implement certain federal projects that were being challenged under environmental laws, like the National Environmental Policy Act ("NEPA"), that were upheld as constitutional. *See Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,* 482 F.3d 1157 (9th Cir. 2007) (canal lining project); *Mount Graham Coalition v. Thomas,* 89 F.3d 554 (9th Cir. 1996) (construction of telescopes)*;* and *Stop H-3 Ass'n v. Dole,* 870 F.2d 1419 (9th Cir. 1989) (construction of highway). In each of these cases, Congress exempted a

specific project by declaring that the government should move forward with implementation "without regard to any other provision of statute or regulation that applies . . ." or some similar language. *See, e.g.*, *Consejo*, 482 F.3d at 1167; *see also Alliance for the Wild Rockies v. Salazar,* 800 F. Supp. 2d 1123, 1126 (D. Mont. 2011) (discussing this line of cases).

But there are several reasons why this Court should not blindly follow the government's reliance on these decisions. First, unlike in this case, none of those cases worked to undo a final judgment by an Article III court. Instead, they are aimed at ending ongoing litigation over a specific project. As noted above, in *Plaut*, the Supreme Court carefully preserved Congress's right to make changes to the law applicable to a pending case, as was deemed constitutional in *Wheeling. See, Plaut*, 514 U.S. at 1457 ("When a new law makes clear it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal . . .."). Thus, while these cases might be relevant to FoA's *Klein* arguments, they have no bearing on FoA's argument that Section 127 violates the Constitution under *Plaut* by impermissibly setting aside the **final** judgment in *Antelope I.*

Second, the Ninth Circuit cases have been criticized as impermissibly adopting a "magic words" approach to *Klein* and *Robertson.* As one district court explained it:

> The way in which Congress acted in trying to achieve a debatable policy change by attaching a rider to the Department of Defense and Full-Year Continuing Appropriations Act of 2011 is a tearing away, an undermining, and a disrespect for the fundamental idea of the rule of law.
>
> . . .

40

> If I were not constrained by what I believe is binding precedent from the Ninth Circuit, and on-point precedent from other circuits, I would hold Section 173 is unconstitutional because it violates the separation of powers doctrine articulated by the Supreme Court in *U.S. v. Klein*, 80 U.S. 128 (1871). However, our Circuit has interpreted *Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992), to hold that so long as Congress uses words "without regard to any other provision of statute or regulation that applies," or something similar, then the doctrine of constitutional avoidance requires the court to impose a saving interpretation provided the statute can be fairly interpreted to render it constitutional.

*Alliance for the Wild Rockies,* 800 F. Supp. 2d at 1125-27.

The Ninth Circuit cases do not, of course, tie the hands of this Court. More importantly, the Ninth Circuit's interpretation does not square with Supreme Court precedent. For instance, in the *Robertson* case, the Court found that Congress made actual, substantive changes to the law by providing alternative means of compliance with the Migratory Bird Treaty Act. 503 U.S. at 438. Likewise in *French*, the Court asserted that Congress must do more than direct the outcome of a pending case; it **must create a new legal standard to apply**. 530 U.S. at 327. This Court should reject the notion that the use of certain language in a rider can be used as a proxy for making an actual change in the law. Certainly, the use of the Ninth Circuit's magic language would not have altered the result in *Klein*.

Third, in those cases, it can be argued that Congress did make actual changes to the law, even if they were subtle ones. Each of these cases involved very similar facts: (1) approval of a project being either directly implemented by the government (such as the highway project in *Stop H-3* or a canal project in *Consejo*) or being built on public land (such as the telescopes in *Mount*

41

*Graham*); (2) Congress had initially delegated to the federal agencies the authority **and discretion** to choose design alternatives for the project; and (3) there was a legal challenge as to whether in carrying out their delegated authority, the agency officials had adequately complied with procedural requirements in federal statutes like NEPA or Section 4(f) of the Department of Transportation Act. In each case, Congress also subsequently passed legislation intended to get these project—tied up in court in some cases for decades—moving again. In doing so, a careful review of the legislation shows that, like in *Wheeling*, Congress made an actual change to the legal circumstances surrounding the project; namely, it removed the original delegation and replaced it with a more specific one—**to build a specific project alternative** "without delay." *See Consejo*, 482 F.3d at 1167 (Congress directed the relevant agency to "without delay, carry out the All American Canal Lining Project identified – (1) as the preferred alternative in the record of decision . . . and (2) in the allocation agreement . . .");[9] *Stop H-3*, 871 F.2d at 1424-25 (directing the Secretary to construct "Interstate Highway H-3 between Halawa interchange to, and including the Halekous Interchange (a distance of 10.7 miles) . . ."); *Mount Graham*, 89 F.3d at 556 ("The United States Forest Service's approval of alternative site 2 (ALT 2) . . . is hereby authorized and approved . . .."). Certainly, these project approvals were

---

[9] In *Consejo,* Congress also made another prospective change in the law by making a treaty between Mexico and the United States the "exclusive authority for identifying, considering, analyzing, or addressing" certain extraterritorial impacts of the project. 482 F.3d at 1167.

specific, prospective, and it was within the authority of Congress to revise the delegations that it had previously made to the implementing agencies.[10]

Section 127, however, is not aimed at removing or revising a delegation to FWS; nor does it seek direct FWS to use its discretion in any given way. Nor could it, as Section 10(c) imposes a mandatory duty on FWS. As Judge Kennedy found, the "text, context, purpose and legislative history of the statute make clear that Congress intended permits for the enhancement of propagation or survival of an endangered species to be issued on a case-by-case basis following an application and public consideration of that application." *Friends of Animals*, 626 F. Supp. 2d at 115-116. Section 127 simply tells the agency to ignore the law as pronounced by Congress in Section 10(c) and interpreted in *Antelope I*. It is one thing to accept broad statutory language to find that Congress intended to limit application of an agency's discretion, but Congress needs to be much more specific if its intent is to change **its own legal proclamations**. Indeed, "[r]epeal of legislation by implication is disfavored." *TVA v Hill*, 437 U.S. 153 at 190 (1978). "This rule 'applies with even **greater** force when the claimed repeal rests solely in an Appropriations Act.'" *Id.*

---

[10] Notably, once Congress took away the agency's discretion and mandated implementation of a specific project, NEPA no longer legally applied and could no longer be used as a basis for the plaintiffs' litigation in these cases. *See Department of Transportation v. Public Citizen*, 541 U.S. 752, 769-70 (2004) (finding that agency did not have to assess environmental effects under NEPA where it had no statutory authority to prevent such effects); *see also Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (citing cases demonstrating that nondiscretionary agency action is excused from the operation of NEPA).

Finally, the Court should be concerned with extending these project approval cases to circumstances, like at bar, involving issuance of licenses and permits that adjudicate private rights. In each of these project cases, at issue is a "public right . . . under the regulation of congress." *See Wheeling*, 59 U.S. at 431; *Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1167 (10th Cir. 2004). But the issuing of permits by an agency—such as contemplated under Section 10—is a delegation of judicial-like authority to adjudicate rights. *See National Wildlife Federation v. Marsh,* 568 F. Supp. 985, 992 n.12 (D.D.C. 1983); *Environmental Protection Info. Ctr., Inc. v. Simpson Timber Co.,* 1999 U.S. Dist. LEXIS 4234, *2 (N.D. Cal. Mar. 30, 1999) ("Section 10 of the ESA gives FWS discretion to issue a permit that allows a private individual to take a species despite the prohibition in section 9"). Adjudications by agencies under the APA determine rights and duties of individuals and include both an agency process and the right of any aggrieved person to seek review by a court. 5 U.S.C. § 702*; Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S. Ct. 431, 437, 92 L. Ed. 568 (1948) (administrative orders are reviewable when "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process"). Allowing Congress to undermine this process—with nothing more than a few words telling the agency (and this Court) to ignore a final adjudication of an issue—is **more** offensive to the Constitution than Congress directing an agency on how to carry out delegated rulemaking authority; indeed usurping the judiciary's duty to adjudicate the scope of such rights is the exact evil the Framers sought to eliminate through the Separation of Powers provision in the Constitution. This is also what distinguishes *Klein*—a case involving the adjudication of the

right of confederate soldiers to reclaim their property—from *Robertson*—
another project case.

### 4.     The wolf rider case involved an actual change of law; it removed judicial review under the APA.

The government and intervenors also argue that this case is on all fours
with the Ninth Circuit's decision in *Alliance for the Wild Rockies v. Salazar*, a
case that challenged the constitutionality of a congressional rider that
implemented a regulation to delist grey wolves in the Northern Rocky
Mountains. 672 F.3d 1170 (9th Cir. 2012). In that case, the Ninth Circuit
upheld Section 1713 of the Department of Defense and Full-Year Continuing
Appropriations Act of 2011, which ordered the Secretary of Interior "to
reissue the 2009 [delisting] rule without regard to the ESA **and without
judicial review**." *Id.* at 1171 (emphasis added). Unlike in this case, Section
1713 did not have any effect on a finalized judgment, so *Plaut* was not in play.
Instead, the contention of the Appellants was that Section 1713
unconstitutionally interfered with ongoing litigation over the legality of the
2009 delisting rule. *Id.* at 1172.

This Court should decline to follow the Wolf-rider case for two reasons.
First, although the Ninth Circuit says otherwise, it appears that the court
merely submits to Congress's use of the so-called "magical words." In fact,
outside of the issue of judicial review (to be discussed momentarily), the
Ninth Circuit failed to articulate any specific legal change that Section 1713
actually made to the law. Instead, the court seems to engage in mental
gymnastics to suggest that the use of such language, while not dispositive,
clearly means under *Robertson* that Congress amended the law (and in that

case Congress did so by apparently providing for no law to apply to the delisting rider at all). *See id*. at 1174.

Second, and more importantly, the Ninth Circuit ultimately seems to rest its decision on a D.C. Circuit opinion finding that Congress's decision to remove the right of judicial review, even when such review is occurring in an Article III court, is itself a sufficient change in the law under *Robertson. Id*. at 1175 (*citing National Coalition to Save Our Mall v. Norton,* 269 F.3d 1092 (D.C. Cir. 2001)). *Norton*, another one of these federal project cases, involved litigation over the construction of a World War II memorial in Washington D.C.. Frustrated that the project was stalled in the courts, Congress stepped in with legislation that directed the National Park Service as to which alternative to build and requiring any changes in the future to comply with the Commemorative Works Act. 269 F.3d at 1093, 1097. The legislation also contained a provision that expressly barred further judicial review of the project. *Id*.

Notably, the D.C. Circuit declined to address "the extent that *Klein* can be read as saying that Congress may not direct the outcome in a pending case without amending the substantive law . . .."[11] *Id.* at 1097*.* Instead, the court held "the Act's purpose as shown in § 1, and its overall structure evince an

---

[11] The Court did suggest, however, that to the extent a substantive change was required, that it did not see the requirement in *Robertson* to be that difficult to meet. *Id* at 1097. FoA does not disagree that the *Robertson* bar is a low one; but the fact remains the Supreme Court in *Robertson* and *French* require an actual change in the law. Certainly, the government and court should be able to identify such a change where the constitutionality of a statute rests on them doing so.

unequivocal intent to cut off judicial review of all the defendant agencies' past actions regarding the Memorial." *Id.* at 1095. In other words, the "preclusion of judicial review indicates Congressional intent to change the law applicable to the project." *Alliance for the Wild Rockies*, 672 F.3d at 1175. Here, however, in enacting Section 127 Congress did not preclude judicial review. Accordingly, these cases cannot form the basis for finding Section 127 constitutional under *Klein.*

## C.    APA Arguments.

### 1.    Even if Constitutional, Section 127 does not preclude judicial review or direct the Court to ignore the ESA.

If Congress was intent on removing federal protections for captive members of the Three Antelope Species it could have substantively amended the ESA, or drafted a new substantive law, that specifically states that these animals are not covered by the ESA. It did not do so here. Instead, it directed the Secretary of Interior to issue a rule to that effect. In the district court's view, the Budget Rider tells not only the Secretary to ignore Section 10 of the ESA, but for the courts to do so too. But this reads too much into the rider.

As an initial matter, there is a strong presumption that agency decisions are subject to judicial review. *See, e.g., Bowen v. Michigan Academy of Family Phys.*, 476 U.S. 667, 670 (1986). In determining whether a statute precludes judicial review, "a court must examine not only the statutory text, but also . . . the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved" (*id.* at 346), "under a general presumption in favor of judicial review which may be overcome by specific language or specific legislative history that is a reliable indicator of

congressional intent" (*id.* at 349). *See also Nat'l Coalition to Save Our Mall*, 269 F.3d at 1094-95.

Here, Section 127 is clearly directed to the Secretary, not the courts. In fact, it is silent with regards to judicial review, which is generally available where FWS issues a Section 10(a)(1) permit. This silence is particularly deafening given that Congress has in the past included a bar on judicial review when passing similar riders (*Alliance for the Wild Rockies* and *Nat'l Coalition to Save Our Mall,* for instance). Finally, the rider itself acknowledges that applicable statutory and regulatory provisions do still apply to the Sport-hunting rider, *to wit "*without regard to any other provision of statute or regulation **that applies to issuance of such rule**." Title I, Section 127 of the Consolidated Appropriations Act, 2014 (emphasis added).

As noted, there is no legislative history telling us what Congress was or was not up to in this particular case. It is possible that the relatively few (possible only one or two) members of Congress that sought to attach the Budget Rider to the appropriations act were less concerned with its constitutionality or subsequent fate in the courts, **then they were interested in appeasing constituents**. While such an act by a congress-member is astonishing, it certainly is not unheard of in politics. As one legal scholar said:

> That members of Congress would vote for legislation they want to be either invalidated or substantially altered may strike some readers as surprising and others as obvious. The idea may surprise people because it is inconsistent with the traditional narrative of legislators as public servants who swear oaths to uphold the Constitution. On the other hand, one might expect that an abstract concern for the Constitution ranks quite low for the average member of Congress. One might expect that members are more likely to be motivated by concerns like representing constituent preferences, effecting good public policy, securing

48

reelection, gaining influence in Congress, and ensuring a remunerative post-congressional career, some or all of which may take precedence over a member's more abstract constitutional principles, if any.

Paul A. Diller, *When Congress Passes an Intentionally Unconstitutional Law: The Military Commissions Act of 2006*, 61 SMU L Rev 281, 295-96 (2008).

In any event, given the silence in Section 127, the lack of any legislative history, and the fact that Section 127 is directed solely toward the Secretary of Interior (with no mention of the courts), the presumption of judicial review should apply and the rider should not be read as to require the courts to ignore statutory and regulatory requirements that clearly apply to the Sport-hunting rule. And in this regard, the district court should have found that the Sport-hunting Rule violates Section 10(c) for reasons best articulated by Judge Kennedy in *Antelope I. Friends of Animals v. Salazar,* 626 F. Supp. 2d 102 (D.D.C. 2009).

## CONCLUSION

For the reasons set forth above, the Court should reverse the district court's decision.

Dated: August 10, 2015                   Respectfully submitted,


                                        s/ Michael Harris
                                        Michael Harris
                                        Friends of Animals
                                        7500 E. Arapahoe Rd., Ste. 385
                                        Centennial, CO 80112
                                        720-949-7791
                                        michaelharris@friendsofanimals.org

                                        Attorney for Appellant


49

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,635 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I relied on my word processor to obtain this count.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced type using Microsoft Office 2013 in 14-point Cambria font.

Dated: August 10, 2015

 s/ Michael Harris

Michael Harris

50

**CERTIFICATE OF SERVICE**

I certify that on this 10th day of August, 2015, the foregoing, **Appellant's Opening Brief**, was served upon all counsel of record through the ECF system.

s/ Michael Harris

Michael Harris

STATUTORY ADDENDUM

Section 127 of the Consolidated Appropriations Act, 2014 (H.R. 3547,
113th Cong., s. 127).


                          antelope rule

     Sec. 127.  Before the end of the 60-day period
beginning on the date
of enactment of this Act, the Secretary of the Interior


[[Page 128 STAT. 316]]

shall reissue the final rule published on September 2,
2005 (70 Fed.
Reg. 52310 et seq.) without regard to any other
provision of statute or
regulation that applies to issuance of such rule.

■ For the reasons discussed in the preamble, the Coast Guard amends 33 CFR Part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for Part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1226, 1231; 46 U.S.C. Chapter 701; 50 U.S.C. 191, 195; 33 CFR 1.05–1(g), 6.04–1, 6.04–6 and 160.5; Pub. L. 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

■ 2. Amend temporary § 165.T13–009 by revising paragraphs (a)(1)(ii) and (a)(2)(ii) to read as follows:

**§ 165.T13–009  Safety Zones: Fireworks displays in the Captain of the Port Portland Zone.**

(a) * * *

(1) * * *

(i) * * *

(ii) Enforcement time and date. 9:30 p.m. to 11 p.m. on August 27, 2005.

(2) * * *

(i) * * *

(ii) Enforcement time and date. 9:30 p.m. to 11 p.m. on September 10, 2005.

* * * * *

Dated: August 23, 2005.

**Patrick G. Gerrity,**
*Captain, U.S. Coast Guard, Captain of the Port, Portland, OR.*

[FR Doc. 05–17473 Filed 9–1–05; 8:45 am]

BILLING CODE 4910–15–P

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**50 CFR Part 17**

**RIN 1018–AT95**

**Endangered and Threatened Wildlife and Plants; Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), are amending the regulations promulgated under the Endangered Species Act (Act) (16 U.S.C. 1531 *et seq.*) to add new regulations to govern certain activities with U.S. captive-bred scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*), which have been listed as endangered. For U.S. captive-bred live wildlife, including embryos and gametes, and sport-hunted trophies of these three species, this rule authorizes certain otherwise prohibited activities that enhance the propagation or survival of the species. International trade in specimens of these species will continue to be subject to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). We have also prepared a final Environmental Assessment with a Finding of No Significant Impact for this final rule under regulations implementing the National Environmental Policy Act of 1969 (NEPA).

**DATES:** This rule is effective October 3, 2005.

**ADDRESSES:** The complete supporting file for this rule is available for public inspection, by appointment, during normal business hours at the Division of Scientific Authority, U.S. Fish and Wildlife Service, 4401 N. Fairfax Drive, Room 750, Arlington, Virginia 22203.

**SUPPLEMENTARY INFORMATION:**

### Background

Historically, the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) occupied the same general region of North Africa. Wild numbers of the three antelopes have declined drastically over the past 50 years. The scimitar-horned oryx may now be extinct in the wild. The declines have resulted primarily from habitat loss, uncontrolled killing, and the inadequacy of existing regulatory mechanisms.

Of the three antelope species, the scimitar-horned oryx is the most threatened with extinction. By the mid-1980s, it was estimated that only a few hundred were left in the wild, with the only viable populations known to be in Chad. However, no sightings of this species in the wild have been reported since the late 1980s, and the *2003 Red List of Threatened Species* shows the status of the scimitar-horned oryx as "extinct in the wild" (World Conservation Union [IUCN] 2003). Captive-bred specimens of this antelope have been placed into large fenced areas for breeding in Morocco and Tunisia. Once animals are reintroduced, continuous natural breeding is anticipated so that wild populations will be re-established.

It is believed that the addax was extirpated from Tunisia during the 1930s, and the last animals were killed in Libya and Algeria in 1966 and 1970, respectively. Remnant populations may still exist in the remote desert areas of Chad, Niger, and Mali, with occasional movements into Libya and Algeria during times of good rainfall. In the IUCN/SSC Antelope Specialist Group's *Global Survey of Antelopes*, the addax is considered to be "regionally extinct" (Mallon and Kingswood 2001). The addax is listed as critically endangered by IUCN (IUCN 2003) and probably numbers fewer than 600 in the wild (Noble 2002).

The dama gazelle is able to utilize both semi-desert and desert habitats, and is smaller than the scimitar-horned oryx or addax. Of the three antelope species, the dama gazelle is the least susceptible to pressures from humans and livestock. The original cause of its decline was uncontrolled killing; however, habitat loss from human settlement and livestock grazing, in addition to civil unrest, has more recently contributed to the decline. It is estimated that only small numbers survive in most of the eight countries within its historical range. The dama gazelle has declined rapidly over the last 20 years, with recent estimates of fewer than 700 in the wild. Noble (2002) estimated that the wild population of addra gazelle (*G. dama ruficollis*) is fewer than 200 specimens, the wild population of dama gazelle (G. dama) is about 500 specimens, and the mhorr gazelle (*G. dama mhorr*) is extinct in the wild. The dama gazelle was previously extirpated from Senegal, but has since been reintroduced, and in 1997, at least 25 animals existed there as part of a semi-captive breeding program (IUCN 2003). The IUCN lists all subspecies of dama gazelles as endangered.

Captive breeding in the United States has enhanced the propagation or survival of the scimitar-horned oryx, addax, and dama gazelle worldwide by rescuing these species from near extinction and providing the founder stock necessary for reintroduction. The scimitar-horned oryx is possibly extinct in the wild; therefore, but for captive breeding, the species might be extinct. Addax and dama gazelle occur in very low numbers in the wild, and a significant percentage of remaining specimens survive only in captivity (71% and 48%, respectively). Captive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds (Mallon and Kingswood 2001). Threats that have reduced these species' numbers to current levels in the wild continue throughout most of the historic range. As future opportunities arise for reintroduction in the antelope range countries, captive-breeding programs will be able to provide genetically

diverse and otherwise suitable specimens.

Some U.S. captive-breeding facilities allow sport hunting of surplus captive-bred animals. Sport hunting of surplus captive-bred animals generates revenue that supports these captive-breeding operations and may relieve hunting pressure on wild populations. For further information regarding background biological information, factors affecting the species, and conservation measures available to scimitar-horned oryx, addax, and dama gazelle, please refer to the November 5, 1991; July 24, 2003; February 1, 2005; and today's **Federal Register** documents discussed below.

## Previous Federal Action

The Mhorr gazelle and Rio de Oro dama gazelle (*G. d. lozanoi*) were listed as endangered throughout their ranges on June 2, 1970 (35 FR 8495). A proposed rule to list all scimitar-horned oryx, addax, and dama gazelle as endangered in the List of Threatened and Endangered Wildlife [50 CFR 17.11(h)] was published on November 5, 1991 (56 FR 56491). We re-opened the comment period to request current information and comments from the public regarding the proposed rule on July 24, 2003 (68 FR 43706), and November 26, 2003 (68 FR 66395). Stakeholders and interested parties, including the public, governmental agencies, the scientific community, industry, and the range countries of the species, were requested to submit comments or information. In accordance with the Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities published on July 1, 1994 (59 FR 34270), we selected three appropriate independent specialists to review the proposed rule. The purpose of such peer review is to ensure that our listing decisions for these species are based on scientifically sound data, assumptions, and analysis. The reviewers selected have considerable knowledge and field experience with scimitar-horned oryx, addax, and dama gazelle biology and conservation. Comments were received from all of the peer reviewers. After review of public comments, we prepared a final rule listing the three species as endangered. The final listing rule is being published in the **Federal Register** concurrent with this final rule regarding U.S. captive-bred specimens.

A consistent theme among the comments received from peer reviewers and stakeholders on the proposed rule to list these species as endangered is the vital role of captive breeding in the conservation of these species. One

reviewer noted that 100% of the world's scimitar-horned oryx (including the reintroduced herds that are in enclosed areas), 71% of the addax, and 48% of the dama gazelles are in captive herds. In response to these comments, on February 1, 2005 (70 FR 5117), we announced a proposed rule and notice of availability of a draft environmental assessment to add new regulations under the Act to govern certain activities with U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle, should they become listed as endangered. The proposed rule covered U.S. captive-bred live wildlife, including embryos and gametes, and sport-hunted trophies, and would authorize certain otherwise prohibited activities that enhance the propagation or survival of the species. The "otherwise prohibited activities" were take; export or re-import; delivery, receipt, carrying, transport or shipment in interstate or foreign commerce, in the course of a commercial activity; or sale or offering for sale in interstate or foreign commerce. In the proposed rule, we found that the scimitar-horned oryx, addax, and dama gazelle are dependent on captive breeding and activities associated with captive breeding for their conservation, and that activities associated with captive breeding within the United States enhance the propagation or survival of these species. Comments were accepted until April 4, 2005.

## Summary of Comments and Recommendations

In response to the proposed rule and notice of availability of a draft Environmental Assessment, the Service received 181 comments from the public. Forty-two commenters expressed support for the proposed rule; these commenters included several nonprofit organizations and private individuals. Twenty-five letters of support were variations of a single form letter. Organizations in support of the rule were the American Zoo and Aquarium Association (AZA), Conservation Force (on behalf of over 10 hunting and taxidermy organizations), the Exotic Wildlife Association, Safari Club International, and the Texas Wildlife Association. The form letter stated that the present situation in which ranchers raise and trade these antelopes benefits species conservation, as well as ranchers and hunters. It argued that ranchers will not be able to contribute to antelope conservation if they are "restricted or penalized" for raising and managing these species.

There were 139 commenters who opposed the proposed rule (153 if co-

signers are included); of those, 96 were form letters. Organizations that opposed the rule included the Animal Protection Institute, Defenders of Wildlife, and The Humane Society of the United States (in joint comments representing 22 organizations), and TRAFFIC North America. A law firm provided a more detailed legal commentary on behalf of The Humane Society of the United States and Defenders of Wildlife. The Environmental Law Clinical Partnership submitted comments on behalf of the Center for Biological Diversity and Friends of Animals. The vast majority of the form letters critical of the proposed rule were the result of a press release issued by Friends of Animals on March 8, 2005. All of these comments included a request to list the three antelope species as endangered wherever they occur and not to include an exemption for U.S. ranches.

The following is a summary of the substantive comments and our responses. We have included the "talking points" included in the form letters. We also received comments that were outside the rule's scope. However, responses to some of these comments are included where doing so will help clarify the purpose of the rule.

*Issue 1:* Although supportive of the proposed rule, several commenters suggested broadening the scope of the rule to cover all captive-bred animals from species listed under the Endangered Species Act, wherever they occur. They also requested that we provide an exemption for all parts and products from a sport-hunted specimen, including meat and fur.

*Service Response 1:* This rule covers only U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle based on information regarding the conservation needs and the role of captive breeding for these particular species. We have exempted only specimens of these three species captive-bred in the United States because an important part of the rule is the requirement that any person participating in these activities maintain records and make these records available to Service officials upon request. It is difficult to establish a record-keeping system for captive-breeding operations outside the United States and even more difficult to access records kept outside the United States. In addition, we have limited ability to monitor captive-breeding operations located outside the United States, and we do not have sufficient information on operations outside the United States to determine whether they meet the standards for enhancement of propagation or survival of the species.

We have limited the rule to captive-bred live wildlife, including embryos and gametes, and sport-hunted trophies because live wildlife, embryos, and gametes are essential to propagation and sport-hunted trophies. The sport-hunted trophy includes more than the mounted specimen. It may be raw or tanned parts, such as bones, hair, head, hide, hooves, horns, meat, skull, rug, taxidermied head, shoulder, or full body mount, of a specimen that was taken by the hunter during a sport hunt for personal use. It does not include articles made from a trophy, such as worked, manufactured, or handicraft items for use as clothing, curios, ornamentation, jewelry, or other utilitarian items for commercial purposes.

*Issue 2:* Some commenters suggested that the rule should include criteria for approving individual captive-breeding operations to receive the benefits of the rule. Some commenters suggested including criteria for managing culls on ranches, requiring that all profits from *ex situ* activities be used for *in situ* conservation, and that the regulated operations must participate in conservation plans to establish wild populations in the range countries.

*Service Response 2:* The successful breeding of these three species in captivity in the United States has added significantly to the global populations of these species. Persons may operate under the provisions of the rule only if the purpose of their activity is associated with the transfer of live wildlife, including embryos and gametes, or with sport hunting in a manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries. The rule also requires that each person claiming the benefit of the exception maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to Service officials. In the final rule we have added two criteria that will ensure that any captive-breeding facility operating under the rule is managing the species to ensure genetic integrity and diversity.

With these criteria, we have determined that U.S. operations that maintain captive-bred specimens of these three species contribute to the enhancement of the propagation or survival of these species, as required under section 10(a)(1)(A) of the Act and 50 CFR 17.22(a)(2). Therefore, the requirements in the rule are adequate and appropriate for these species.

*Issue 3:* One commenter noted that the proposed rule referred to "populations" of captive-bred scimitar-horned oryx, dama gazelle, and addax,

and that this usage is inconsistent with the definition of this term in the applicable regulations.

*Service Response 3:* We agree that captive-held animals may not qualify as populations as defined at 50 CFR 17.3 and have changed the rule accordingly.

*Issue 4:* Some commenters argued that the Service has failed to show how these captive-breeding operations meet the standards for the enhancement of propagation or survival under section 10 of the Act and failed to explain how the Service's approach will benefit wild populations. One commenter argued that the Service offered no support for its statement that hunting of captive-bred animals relieves pressure on wild populations.

*Service Response 4:* The rule discusses how authorizing these activities for U.S. captive-breeding operations enhances the propagation of these species by providing an incentive to continue to raise animals in captivity while managing their genetic diversity, serving as repositories for surplus animals, and facilitating the movement of specimens between breeding facilities. We found that authorizing these activities also enhances the survival of the species by providing an incentive to continue captive-breeding and genetic management programs, which have (in conjunction with foreign captive-breeding operations) prevented the possible extinction of at least one of the species, contributed significantly to the total number of remaining animals of the other two species, and provided founder stock for reintroduction.

As explained in the proposed rule, providing opportunities for sport hunting of captive-bred wildlife may relieve pressure on wild populations of the species by providing an alternative to legal and illegal hunting of animals in the wild.

*Issue 5:* The majority of commenters opposing the proposed rule stated that captive-bred specimens from U.S. ranches do not contribute to reintroduction efforts in range countries, nor are specimens from U.S. ranches needed for these efforts.

*Service Response 5:* In our proposed rule, we mentioned that 30 founder lines of scimitar-horned oryx are represented on at least one ranch that works closely with the Scimitar-horned Oryx Species Survival Plan (SSP). The SSP has provided specimens for reintroduction programs in range countries, and the ranch will contribute specimens when needed. Indeed, one commenter noted that he recently shipped 44 dama gazelles, 32 addax, and 10 scimitar-horned oryx that were captive-bred on U.S. ranches to a private

wildlife sanctuary in the United Arab Emirates, where they will be bred to produce specimens for eventual release in the historic range. The commenter added that the Conservation Committee of the Exotic Wildlife Association is developing a feasibility study to determine how ranchers can best contribute specimens to reintroduction programs. Between October 2003 and March 2005, the U.S. Fish and Wildlife Service's Division of Management Authority issued CITES permits for the export of U.S. captive-bred scimitar-horned oryx (45 specimens), addax (90 specimens), and dama gazelle (70 specimens) to the United Arab Emirates for captive breeding. Most of these specimens were captive-bred on U.S. ranches.

We do not know when or to what degree any particular ranch will be called upon to provide specimens for reintroduction efforts or research necessary to facilitate such programs. However, their continued breeding of these species, and their monitoring and maintaining genetic diversity, will ensure that specimens will be available when the appropriate conditions for reintroduction exist in range countries. As one commenter pointed out, other species that are captive-bred on U.S. ranches, such as Grevy's zebra and blackbuck, have been used in research and reintroduction projects.

*Issue 6:* Several commenters indicated that conservation resulting from ranches that allow sport hunting is not comparable to zoo-based conservation programs. They also noted that the AZA acquisition—disposition policy prohibits AZA institutions from supplying animals to or receiving them from ranches that allow hunting of those species. Thus, they argue that few ranches can cooperate with zoo programs.

*Service Response 6:* Both zoos and ranches may breed and otherwise contribute to the conservation of these species, whether or not there is collaboration. We acknowledge that some ranches breed these species and do not allow hunting of them, whereas others do. However, we have found that ranches that meet the regulatory criteria, whether or not they allow sport hunting of the three antelopes, enhance the propagation or survival of these species. According to several commenters, many ranches, whether offering sport hunts or not, have provided research opportunities to study these species in partnership with academic institutions.

*Issue 7:* Some commenters contended that hunting on U.S. ranches may undermine the conservation of wild specimens by increasing the demand for

trophies or creating incentives for illegal trade.

*Service Response 7:* There is no evidence that sport hunting of captive-bred animals increases poaching of these species in the wild. Sport hunting of these species has been occurring on ranches in the U.S. for more than 20 years. There is no evidence that the availability of captive-bred animals to trophy hunters has contributed in any way to hunting pressure on these species in the wild. Furthermore, the United States and range-country governments, as well as most countries worldwide, are required to strictly regulate trade in these species because the scimitar-horned oryx, addax, and dama gazelle are listed in Appendix I of CITES. Listing in CITES Appendix I requires strict regulation of international movement of these species, which may only be authorized in "exceptional circumstances." With the listing of these three antelopes as endangered under the Act, the regulatory protections will be further strengthened, not reduced, because both CITES and Act regulations will apply. Sport hunting of surplus animals from captive-breeding operations in the United States is anticipated to reduce the incentive for removal of wild animals in their range countries by providing an alternative source of specimens.

*Issue 8:* One commenter stated that ranches that breed specimens select for trophy quality, which may reduce genetic fitness.

*Service Response 8:* We know that 30 founder lines of scimitar-horned oryx are represented on at least one ranch that works closely with the Scimitar-horned Oryx SSP. We have received no indication in the literature or from commenters indicating that breeding programs on ranches have caused a loss in overall genetic variation in U.S. captive-bred antelopes. In addition, we have added criteria to the final rule that will prevent hybridization of species or subspecies and require that all specimens be managed in a manner that maintains genetic diversity.

*Issue 9:* One commenter suggested that surplus captive-bred specimens from ranches should be relocated, not killed.

*Service Response 9:* Although thousands of these animals have been produced in captivity, the number of animals released into the wild has been limited. Reintroduction programs cannot absorb the entire production of captive-breeding operations for logistical reasons and because reintroductions—for almost any mammal—are limited to small groups of animals that can be conditioned and

monitored to ensure their survival. The amount of secure habitat for reintroductions is also a factor limiting the numbers of animals that can be released. In our proposed rule, we stated that some killing of surplus specimens may be necessary to manage captive herds (*e.g.*, to reduce aggression among males) and to finance captive-breeding operations. In addition, the United States does not have the jurisdiction to direct another country in regard to when it should accept animals and when it should release them to the wild.

*Issue 10:* One commenter asserted that the Service cannot propose any exemptions or permits for a species under the Act until the species is actually listed under the Act; in doing so, they argue, the Service has violated its consultation responsibilities under section 7 of the Act.

*Service Response 10:* It was critical that development of a rule that provides an incentive to continue captive breeding of these species proceed concurrently with the determination of their legal status under the Act to ensure that no breeding programs would be disrupted by a final listing determination. This final rule has therefore been released concurrently with the final listing determination to ensure there is no confusion regarding the authority of the Service to regulate such activities for these species. There is no limitation under either the Act or the Administrative Procedure Act for related proposed rulemakings to proceed concurrently to the final rule stage.

After considering all of the effects that would be posed by the proposed rule, we determined that the measures included in the final rule would reduce the threat of extinction to the species by facilitating captive breeding. Therefore, no conference procedure under section 7(a)(4) of the Act is required.

*Issue 11:* One commenter believed that the proposed rule would set a precedent for legal hunting of listed species in captivity.

*Service Response 11:* We disagree. The development of this rule was specific to these three species and included consideration of specific threats, specific conservation needs, and the benefits of captive breeding to all three species. In no way should the development of this regulation for these species under the Act be interpreted as a statement of what regulatory scheme would be appropriate for other listed species also found in captivity within the United States.

*Issue 12:* One commenter argued that we did not establish how conservation efforts for the species would be

hampered by the application of current Act regulatory systems to captive-breeding operations.

*Service Response 12:* The Act does not require a particular regulatory system be used to implement the Act. Rather, the Act requires that authorized activities must meet standards for enhancing the propagation or survival of the species. We have found that the regulatory framework established for the three antelope meets these standards and is the best management scheme to encourage continued captive breeding and management of these species. Similar regulations, the captive-bred wildlife regulations at 50 CFR 17.21(g), have been used as a basis for developing this rule. However, the current regulations do not cover species for which sport hunting is an integral part of management of the species, and they do not provide an authorization for the interstate and foreign commerce of sport-hunted trophies. Thus, the movement of sport-hunted trophies taken for management purposes would be limited unless an Act permit or authorization had been granted. Not requiring each person to apply for a permit or authorization prior to engaging in these activities provides an important incentive to these operations to continue their captive-breeding and management programs.

*Issue 13:* One commenter argued that the Service does not have the authority under the Act to propose this rule for an endangered species.

*Service Response 13:* As explained above, captive-breeding operations within the United States that meet the criteria established by this rule meet the standards for both enhancing the propagation and enhancing the survival of these three species, as shown by the findings for each of the criteria found at 50 CFR 17.22(a)(2). While the Service typically authorizes activities under section 10(a)(1)(A) of the Act on a case-by-case basis through the issuance of individual permits or authorizations, there is no requirement that we may do so only via this process. The requirements for notification and opportunity for public comment under section 10(c) and publication of final determinations under section 10(d) have been satisfied through this rulemaking process.

*Issue 14:* A few commenters asserted that any regulatory scheme that facilitates killing of animals as contributing to conservation is not supported by the law except under extremely narrow circumstances.

*Service Response 14:* Section 10 of the Act does not set absolute limits on the Service's ability to authorize the taking

of an endangered species. In fact, the section specifically states that the Secretary may authorize any act otherwise prohibited under section 9, which includes take. Take includes to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect an endangered species, or attempt to engage in any such conduct (see section 3(19) of the Act). Section 10(a)(1)(A) does require that any authorized activity must enhance the propagation or survival of the species overall. An example of when take of a listed species benefits conservation is our regulation on the import of sport-hunted African elephant (*Loxodonta africana*) trophies. The African elephant is listed as threatened under the Act. The import of sport-hunted trophies from African countries is only allowed when certain criteria are met, including that "a determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species" [50 CFR 17.40 (e)(3)(iii)(C)]. When evaluating a hunting program in an African country, Service biologists consider whether revenue derived from the hunt is used to further elephant conservation. These funds have been used to support anti-poaching activities and establish game management areas with important elephant habitat.

*Issue 15:* One commenter opposed the rule because it would deny Act protection to most members of the three species.

*Service Response 15:* This rule does not deny Act protection to most members of the three species. All of the prohibitions under section 9 apply to all animals in the wild. These same prohibitions also apply to any animal captive-bred outside the United States. This regulation applies only to members of the species that were captive-bred within the United States. The comments that noted that many of the animals found in captivity are located in the United States support the Service's determination that U.S. captive-breeding operations have played a significant role in the propagation or survival of all three species and that a regulatory scheme that facilitates the continuation of these activities is appropriate for the species.

*Issue 16:* Many commenters opposed the rule because of their philosophical opposition to trophy hunting or hunting in general. Others expressed concerns regarding "canned hunts."

*Service Response 16:* Hunting has a long history of contributing to conservation in the United States. The Service acknowledges that wildlife populations and habitats have been sustained through the financial contributions of hunters. The proposed rule authorizes the taking of individual animals, but only if the purpose of the taking contributes to increasing or sustaining captive antelope numbers or to potential reintroduction to range countries. This approach to management has caused captive-bred specimens to proliferate, thus contributing to their propagation and increasing their chances of survival.

## Contribution of Captive Breeding to Species Propagation or Survival

A peer reviewer of the proposed rule for listing the three antelope species as endangered noted that 100% of the world's scimitar-horned oryx population (including the reintroduced specimens that are in enclosed areas), 71% of the addax population, and 48% of the dama gazelle population are in captive herds. Captive-breeding programs operated by zoos and private ranches have effectively increased the number of these animals while genetically managing their herds. International studbook keepers and managers of the species in captivity manage these programs in a manner that maintains the captive specimens as a demographically and genetically diverse megapopulation (Mallon and Kingswood 2001). In the 1980s and 1990s, captive-breeding operations in Germany, the United Kingdom, and the United States provided scimitar-horned oryx, addax, and dama gazelle to Bou-Hedma National Park in Tunisia (Mallon and Kingswood 2001). These animals have become the founding stock of captive *in situ* herds that have grown substantially since 1995. The IUCN Species Survival Commission has proposed that some of the antelopes produced be used to establish other captive-breeding operations within the range countries or, given the appropriate conditions in the wild, for reintroduction. Similar *in situ* breeding programs for future reintroduction are occurring in Senegal and Morocco with captive stock produced and provided by breeding operations outside of these countries.

This rule does not authorize or lead to the removal of any specimen of the three species from the wild. This rule would not affect prohibitions against possession and other acts with unlawfully taken wildlife or importation. This rule only applies to specimens that are captive bred in the United States. Any person who wishes to engage in any act that is prohibited under the Endangered Species Act with a specimen that has not been captive bred in the United States will still need to obtain a permit or authorization under the Act. The issuance or denial of such permits or authorizations is decided on a case-by-case basis and only after all required findings have been made. The rule contains provisions that will allow the Service to monitor the activities being carried out by captive-breeding operations within the United States to ensure that these activities continue to provide a benefit to the three antelope species. The rule also does not include dead specimens other than sport-hunted trophies or specimens derived from activities that do not meet the criteria.

The probable positive direct and indirect effects of facilitating captive breeding in the United States for the conservation of scimitar-horned oryx, addax, and dama gazelle are exemplified in the research and reintroduction efforts involving the AZA and the Sahelo-Saharan Interest Group (SSIG) of the United Nations Environment Program. In North America, the AZA manages captive scimitar-horned oryx, addax, and dama gazelle through SSPs. The captive scimitar-horned oryx in North America and Europe are derived from two captures that occurred in Chad in 1963 and 1966. Members of the Scimitar-horned Oryx SSP are faced with three challenges (Antelope Taxon Advisory Group 2002b): They must manage the captive herds to maximize the genetic contributions of founder stock; second, they must find solutions for disposition of surplus animals given the limited holding space among SSP members; and third, they must find facilities that can house individual males or bachelor herds. Only through inter-institutional collaboration among members, such as the exchange of live specimens or gametes to maintain genetic diversity, can these challenges be surmounted. In one example, 30 founder lines are represented at 1 ranch that works closely with the SSP. Since typical oryx herds consist of 1 male and 10–30 females, there will always be a need to manage nonbreeding males. Although the SSP consists mostly of AZA-accredited zoos, ranches can serve as repositories for surplus animals or assist in gene pool management. These partnerships also provide opportunities for behavioral and other research in spacious areas found in some zoos and ranches that can be used in forming and preparing groups of animals for reintroduction.

Members of the Addax SSP have also been involved in translocating animals for captive breeding and release in Tunisia and Morocco. Animals held by members of the SSP are included in an international studbook for this species

that includes addaxes in zoos and private facilities worldwide (Antelope Taxon Advisory Group 2002a). The dama gazelle North American studbook also includes zoos and ranch participants worldwide. Some of the specimens bred in zoos originated from ranched stock (Metzler 2000).

Both zoos and ranches may breed and otherwise contribute to the conservation of these species, whether or not there is collaboration. According to several commenters on the proposed regulation, many ranches, whether offering hunts or not, have provided research opportunities to study these species in partnership with academic institutions.

A commenter on the proposed regulation noted that he recently shipped 44 dama gazelles, 32 addax, and 10 scimitar-horned oryx that were captive-bred on U.S. ranches to a private wildlife sanctuary in the United Arab Emirates, where they will be bred to produce specimens for eventual release in the historic range. We note that between October 2003 and March 2005, the U.S. Fish and Wildlife Service's Division of Management Authority issued CITES permits for the export of U.S. captive-bred scimitar-horned oryx (45 specimens), addax (90 specimens), and dama gazelle (70 specimens) to the United Arab Emirates for captive breeding. Most of these specimens were captive-bred on U.S. ranches. We do not know when or to what degree any particular ranch will be called upon to provide specimens for reintroduction efforts or research necessary to facilitate such programs. However, their continued breeding of these species, and their monitoring and maintaining genetic diversity, will ensure that specimens will be available when the appropriate conditions for reintroduction exist in range countries.

We are not aware of any negative direct or indirect effects from this rule on wild populations. This rule does not authorize or lead to the removal of any specimen of the three species from the wild. Indeed, many facilities in the United States that breed these species are working with range countries to breed and reintroduce specimens in areas that they have occupied historically. In 2000, the SSIG was formed as a consortium of individuals and organizations interested in conserving Sahelo-Saharan antelopes and their ecosystems (SSIG 2002). The SSIG has members representing 17 countries and shares information on wildlife management and conservation, captive breeding, wildlife health and husbandry, establishment and management of protected areas, and wildlife survey methods. Members are

involved in in *situ* and *ex situ* conservation efforts for the scimitar-horned oryx, addax, and dama gazelle. Several of its projects involve the translocation of captive-bred antelopes to range countries for establishment of herds in large fenced breeding areas prior to reintroduction. A commenter on the proposed rule noted that the Conservation Committee of the Exotic Wildlife Association is developing a feasibility study to determine how ranchers can best contribute specimens to reintroduction programs.

The rule does not directly or indirectly conflict with any known program intended to enhance the survival probabilities of the three antelope species. The SSP and SSIG programs work collaboratively with range country scientists and governments. Although the rule does not authorize or lead to the removal of any specimen of the three species from the wild, it may contribute to other programs by providing founder stock for reintroduction or research.

This rule will reduce the threat of extinction facing the scimitar-horned oryx, addax, and dama gazelle by facilitating captive breeding for all three species in the United States. Based on information available to the Service, captive breeding in the United States has contributed significantly to the conservation of these species. Scimitar-horned oryx may be extinct in the wild; therefore, but for captive breeding, the species might be extinct. Addax and dama gazelle occur in very low numbers in the wild and a significant percentage of remaining specimens survive only through captivity (71% and 48% respectively). Threats that have reduced the species' populations to current levels in the wild continue throughout most of the historic range. As future opportunities arise for reintroduction in the antelope range countries, captive-breeding programs will be able to provide genetically diverse and otherwise suitable specimens. Ranches and large captive-wildlife parks for non-native herds (*e.g.*, Bamberger Ranch, Texas; The Wilds, Ohio; Fossil Rim Wildlife Center, Texas) are able to provide large areas of land that simulate the species' native habitat and can accommodate a larger number of specimens than can most urban zoos. Thus, they provide opportunities for research, breeding, and preparing antelopes for eventual reintroduction.

International consortia of zoos, private owners, researchers, and range country decision makers have acknowledged the need to reduce threats in the range countries (*e.g.*, habitat protection, reduce poaching) of

the scimitar-horned oryx, addax, and dama gazelle. They also recognize that, but for captive breeding, it would be difficult, or in some cases impossible, to restore the species in the wild, particularly for species that have become extinct in the wild.

One way this rule will reduce the threat of extinction is by allowing limited sport hunting of U.S. captive-bred specimens to facilitate captive breeding of all three species. Given the cost of establishing and maintaining a large captive breeding operation and the large amount of land that is required to maintain bachelor herds or surplus animals, it is difficult for many private landowners to participate in such endeavors. An incentive to facilitate these captive breeding operations and ensure that genetically viable herds are available for future reintroduction programs is to allow the limited hunting of captive-bred specimens. Most of the available land for captive-held specimens is owned by private landowners (ranchers). In Texas, the number of ranched scimitar-horned oryx went from 32 specimens in 1979 to 2,145 in 1996; addax increased from 2 specimens in 1971 to 1,824 in 1996; and dama gazelle increased from 9 specimens in 1979 to 369 in 2003 (Mungall 2004). These increases were due mostly to captive breeding at the ranches supplemented with some imported captive-bred founder stock. Limited hunting of captive-bred specimens facilitated these increases by generating revenue for herd management and the operation of the facility. Ranches also need to manage herds demographically (*i.e.*, appropriate age and gender numbers and ratios) and genetically (*i.e.*, maximize genetic diversity). Such management may include culling specimens, which may be accomplished through hunting. For example, a ranch may need to reduce the number of adult males to achieve the necessary sex ratio for establishing a polygamous breeding group and facilitating the typical breeding behavior of the species. Hunting also provides an economic incentive for private landowners such as ranchers to continue to breed these species and maintain them as a genetic reservoir for future reintroduction or research, and as a repository for excess males from other captive herds. Sport hunting of U.S. captive-bred specimens may reduce the threat of extinction of wild populations by providing an alternative to legal and illegal hunting of wild specimens in range countries. Thus, hunting of U.S. captive-bred specimens of these species

reduces the threat of the species' extinction.

The movement of live U.S. captive-bred specimens, both by interstate transport and export, is critical to the captive-breeding efforts to manage the captive herds as well as provide animals for reintroduction. Between October 2003 and March 2005, CITES permits were issued for the export of U.S. captive-bred scimitar-horned oryx (45 specimens), addax (90 specimens), and dama gazelle (70 specimens). Studbook managers may recommend that specimens be exchanged among breeding institutions to achieve management goals for genetic or other reasons. These institutions may be separated by State (within the United States) or national boundaries. Zoos in Germany, for example, exchange specimens with zoos in the United States, as recommended by the International Studbook Keeper. The need to quickly move U.S. captive-bred specimens among breeding facilities is reflected in this rule by allowing such movement without requiring a separate ESA permit or authorization.

The opinions or views of scientists or other persons or organizations having expertise concerning these species have been taken into account in this rule. The comments received from peer reviewers on our proposed rule for listing the three antelopes as endangered alerted us to the vital role that captive breeding, whether at zoos or ranches, is playing in species recovery and reintroduction. Comments on the proposed new regulation provided some information. More general comments are addressed in the summary of comments. Thus, the opinions or views of scientists or other persons or organizations having expertise concerning the three antelope species and other germane matters have been considered in the development of this rule.

The U.S. expertise, facilities, and other resources available to captive-breeding operations have resulted in such a high level of breeding success that the SSIG estimated that there are 4,000–5,000 scimitar-horned oryx, 1,500 addax, and 750 dama gazelle in captivity worldwide, many of which are held in the United States. The U.S. specimens has resulted from very few wild-caught founders that have been carefully managed to increase the numbers of specimens and maintain genetic diversity. Husbandry methods are shared by participants in regional and international studbooks through specialist meetings such as the Antelope Taxon Advisory Group meeting held at the AZA Annual Meeting. Such cooperation allows the sharing of resources among participants of coordinated breeding programs as specimens are moved from one facility to another according to management recommendations. As indicated by the Scimitar-horned Oryx SSP, one of the major issues confronting the captive-breeding community is how to preserve the necessary genetic diversity and manage population surplus, particularly given the space limitations at some facilities. Some private ranches in the United States have contributed to the success of captive-breeding programs by absorbing the surplus specimens produced in zoos so that zoos can utilize available space for more genetically important specimens or the appropriate herd social structure. Ranches have also enlarged the captive populations because they are able to dedicate more space to these species, and therefore house more specimens, than can zoos.

Based on the best available scientific information and comments received from peer reviewers, non-government organizations, and the public, we have determined that U.S. operations that breed scimitar-horned oryx, addax, and dama gazelle have already contributed significantly to the propagation or survival of the three antelope species. Because of the need to facilitate the continued captive breeding of these species in private ranches and zoos, this rule is an appropriate regulatory management provision for scimitar-horned oryx, addax, and dama gazelle captive-bred in the United States. The probable direct and indirect effects of this rule will facilitate activities associated with captive breeding and thus contribute to the propagation and survival of the species. The rule will not, directly or indirectly, conflict with any known program intended to enhance the survival of populations in the wild. By maintaining genetic diversity and providing captive-bred stock for reintroduction efforts and research, captive-breeding operations in the United States are reducing the threat of extinction of the three antelope species. The rule facilitates the functioning of conservation programs, including those organized by the AZA and SSIG, and encourages the breeding and management of these antelopes. In fact, the rule provides an incentive to continue captive breeding. Therefore, we find that authorizing certain otherwise prohibited activities for U.S. captive-bred live wildlife, including embryos and gametes, and sport-hunted trophies of the three species that meet specific criteria enhances the propagation and survival of the species.

## Endangered Species Act 10(d) Finding

The Service may grant exceptions under subsections (a)(1)(A) and (b) of the Act only if it finds and publishes the findings in the **Federal Register** that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 2 of the Act. Based on the comments received from captive-breeding operation representatives demonstrating their commitment to the continued enhancement of the propagation and survival of the scimitar-horned oryx, addax, and dama gazelle, we find that the exceptions in this rule have been applied for in good faith.

We also find that the rule will not operate to the disadvantage of these species. In fact, it will benefit them by assisting in their rescue from near extinction and providing the founder stock necessary for reintroduction. The scimitar-horned oryx is possibly extinct in the wild and therefore, but for captive breeding, the species might be extinct. For addax and dama gazelle, they occur in very low numbers in the wild, and a significant percentage of remaining specimens survive only in captivity (71% and 48%, respectively). Captive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds. As future opportunities arise for reintroduction in the antelope range countries, U.S. captive-breeding programs will be able to provide genetically diverse and otherwise suitable specimens.

Section 2 of the Act defines the purpose of the Act as providing a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, providing a program for the conservation of such endangered species and threatened species, and taking such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in paragraph 2(a) of the Act. One of the stated policies of the Act is for all federal agencies to seek to conserve listed species and use their authorities in furtherance of the purposes of the Act. In section 3, the term "conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." The definition specifically

includes propagation and transplantation as methods that can lead to the recovery of listed species, both of which are components of captive breeding of the three antelope species. As discussed above, the rule provides incentive to U.S. captive-breeding operations that will ensure continued propagation of genetically diverse specimens of these three species, which can serve as a reservoir for future reintroductions and assist in research. Therefore, we find that this rule is consistent with section 2 of the Act.

### Description of This Rule

We are amending 50 CFR 17.21 by adding a new paragraph (h), which will apply to U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle. The provision allows for the take; export or re-import; delivery, receipt, carrying, transport or shipment in interstate or foreign commerce, in the course of a commercial activity; or sale or offering for sale in interstate or foreign commerce of U.S. captive-bred live scimitar-horned oryx, addax, or dama gazelle, including embryos and gametes, and sport-hunted trophies, as long as certain criteria are met.

Any exports of such specimens must meet the marking and reporting requirements for export [50 CFR 17.21(g)(4) and part 14], general permit requirements and conditions (50 CFR part 13), and all CITES requirements (50 CFR part 23). Each specimen to be re-imported must be uniquely identified by a tattoo or other means that is reported on the required documentation. Each specimen at the captive-breeding operation must be managed to prevent hybridization of species or subspecies and must be managed in a manner that maintains genetic diversity.

Each person claiming the benefit of the exception of this rule must maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to Service officials for inspection at reasonable hours set forth in 50 CFR 13.46 and 13.47.

### Effects of This Rule

With this rule we find that the scimitar-horned oryx, addax, and dama gazelle are dependent on captive breeding and activities associated with captive breeding for their conservation, and that activities associated with captive breeding within the United States enhance the propagation and survival of these species. Therefore, persons who wish to engage in the specified otherwise prohibited activities that meet the criteria for enhancement of the propagation or survival of these

species may do so without obtaining an individual Endangered Species Act permit.

This rule does not authorize any activity for any specimen of the three species from the wild. It also does not affect provisions relating to importation or possession and other acts with unlawfully taken wildlife. In addition, this rule applies only to specimens that are captive-bred in the United States. Any person who wishes to engage in any act that is prohibited under the Endangered Species Act with a specimen that has not been captive-bred in the United States or from a facility that does not meet the criteria of this rule will need to obtain an individual permit under the Act. The issuance or denial of such permits is decided on a case-by-case basis and only after all required findings have been made.

This rule does not affect the CITES requirements for these species. Therefore, any import into or export from the United States of specimens of these species would not be authorized until all CITES requirements have been met. See the proposed rule for more information on the application of CITES to these activities. The existing protections under CITES, in conjunction with the new provisions for the species under this rule, create an appropriate regulatory framework that protects populations in the wild, ensures appropriate management of U.S. captive-bred specimens, and provides an incentive for future captive breeding.

### Required Determinations

A Record of Compliance was prepared for the proposed rule. A Record of Compliance certifies that a rulemaking action complies with the various statutory, Executive Order, and Department Manual requirements applicable to rulemaking. Without this new regulation, individuals subject to the jurisdiction of the United States would need individual permits to engage in various otherwise prohibited activities, including domestic and international trade in live and sport-hunted captive-bred specimens for commercial purposes. Captive-bred specimens in international trade for noncommercial purposes (*e.g.*, breeding loans requiring export) would have to be authorized through the permit process. This process takes time, sometimes causing delays in moving animals for breeding or reintroduction. Such movements must often be completed within a narrow timeframe and can be further complicated by quarantine requirements and other logistics. We note that the economic effects of this rule do not rise to the level of

"significant" under the following required determinations.

### Regulatory Planning and Review

In accordance with the criteria in Executive Order 12866, the Office of Management and Budget has determined that this rule is not a significant regulatory action. The rule will not have an annual economic impact of more than $100 million, or significantly affect any economic sector, productivity, jobs, the environment, or other units of government. This rule will reduce the regulatory impacts on captive-breeding operations that breed the endangered scimitar-horned oryx, addax, and dama gazelle because it provides exemptions to certain prohibitions of section 9 of the Act that would otherwise apply to businesses and individuals under U.S. jurisdiction. The exemptions to the prohibitions of the Act provided by this rule will reduce economic costs of the listing. The economic effect of the rule is a benefit to the captive-breeding operations for the three antelopes because it allows the take and interstate commerce of captive-bred specimens. The rule, by itself, will not have an annual economic impact of more than $100 million, or significantly affect any economic sector, productivity, jobs, the environment, or other units of government. A cost-benefit and economic analysis is not required. This rule does not create inconsistencies with other Federal agencies' actions. Thus, no Federal agency's actions are affected by this final rule.

This rule will not materially affect entitlements, grants, user fees, loan programs, or the rights and obligations of their recipients. The rule will not raise novel legal or policy issues. The Service has previously promulgated species-specific rules for other endangered and threatened species, including other rules for captive-bred specimens.

### Regulatory Flexibility Act

To assess the effects of the rule on small entities, we focused on the exotic wildlife ranching community in the United States because these are the entities most likely to be affected by the rule. We determined that this rule will not have a significant economic effect on a substantial number of small entities as defined under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) because it allows for the continued breeding of the species and trade in live specimens, embryos, gametes, and sport-hunted trophies of the three antelopes. An initial Regulatory Flexibility Analysis was not required.

Accordingly, a Small Entity Compliance Guide was not required. This rule reduces the regulatory impact, because without this rule all prohibitions of section 9 of the Endangered Species Act would apply (*i.e.*, take; export; delivery, receipt, carrying, transport or shipment in interstate or foreign commerce, in the course of a commercial activity; or sale or offering for sale in interstate or foreign commerce).

**Small Business Regulatory Enforcement Fairness Act**

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule would reduce certain regulatory obligations and will not have an annual effect on the economy of $100 million or more; will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; and will not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

**Unfunded Mandates Reform Act**

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501, *et seq.*), this rule does not impose an unfunded mandate on State, local, or tribal governments or the private sector of more than $100 million per year. This final rule will not have a significant or unique effect on State, local, or tribal governments or the private sector. A Small Government Agency Plan is not required.

**Takings**

In accordance with Executive Order 12630, this final rule does not have significant takings implications. By reducing the regulatory burden placed on affected individuals resulting from the listing of the three antelopes as endangered species, this rule will not affect the likelihood of potential takings. Affected individuals will have more freedom to pursue activities that involve captive-bred specimens without first obtaining individual authorization.

**Federalism**

In accordance with Executive Order 13132, this final rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

**Civil Justice Reform**

In accordance with Executive Order 12988, the Office of the Solicitor has determined that this final rule does not

unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Executive Order.

**Paperwork Reduction Act**

The Office of Management and Budget approved the information collection in part 17 and assigned OMB Control Numbers 1018–0093 and 1018–0094. This rule does not impose new reporting or recordkeeping requirements on State or local governments, individuals, businesses, or organizations. We cannot conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**National Environmental Policy Act**

Council on Environmental Quality regulations in 40 CFR 1501.3(b) state that an agency "may prepare an environmental assessment on any action at any time in order to assist agency planning and decision making." We drafted an environmental assessment for the proposed rule in accordance with the criteria of the National Environmental Policy Act of 1969 (NEPA). A final environmental assessment was prepared based on comments received and a Finding of No Significant Impact was prepared.

**Government-to-Government Relationship With Tribes**

In accordance with the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951) and 512 DM 2, we have evaluated possible effects on Federally recognized Indian tribes and have determined that there are no effects.

**Executive Order 13211**

We have evaluated this final rule in accordance with E.O. 13211 and have determined that this rule will have no effects on energy supply, distribution, or use. Therefore, this action is not a significant energy action, and no Statement of Energy Effects is required.

**References Cited**

Antelope Taxon Advisory Group. 2002a. Addax Fact Sheet. American Zoo and Aquarium Association. *http://www.csew.com/antelopetag.*

Antelope Taxon Advisory Group. 2002b. Scimitar-Horned Oryx Fact Sheet. American Zoo and Aquarium Association. *http://www.csew.com/antelopetag.*

IUCN (World Conservation Union). 2003. 2003 IUCN Red List of Threatened Species. *http://www.iucn.org.*

Mallon, D.P., and S.C. Kingswood (Compilers). 2001. *Antelopes. Part 4: North Africa, the Middle East, and Asia. Global Survey and Regional Action Plans.* SSC

Antelope Specialist Group. IUCN, Gland, Switzerland and Cambridge, UK. Viii + 260 pp.

Metzler, S. 2000. Addra Gazelle *Gazella dama ruficollis* North American Regional Studbook: December 31, 1999 Update. Disney's Animal Kingdom: Orlando, Florida.

Mungall, E.C. 2004. Submission for the Comment Period Listing of Scimitar-horned Oryx, Addax, and Dama Gazelle Under the Endangered Species Act: A Technical Report Prepared for the Exotic Wildlife Association.

Noble, D. 2002. Overview and status of captive antelope populations. Third Annual Sahelo-Saharan Interest Group Meeting, p.41

SSIG (Sahelo—Saharan Interest Group) 2002. Third Annual Sahelo—Saharan Interest Group Meeting Proceedings. Available from S. Monfort, Chair SSIG, National Zoological Park. Smithsonian Institution: Washington, DC.

**Author**

The primary author of this notice is Robert R. Gabel, Chief, Division of Scientific Authority, U.S. Fish and Wildlife Service (see **ADDRESSES** section).

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, and Transportation.

**Regulation Promulgation**

■ Accordingly, we hereby amend part 17 of subpart C, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

**PART 17—[AMENDED]**

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500; unless otherwise noted.

■ 2. Amend § 17.21 by adding paragraph (h) to read as follows:

**§ 17.21   Prohibitions.**

\*    \*    \*    \*    \*

(h) *U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle.* Notwithstanding paragraphs (b), (c), (e), and (f) of this section, any person subject to the jurisdiction of the United States may take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce live wildlife, including embryos and gametes, and sport-hunted trophies of scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) provided:

(1) The purpose of such activity is associated with the management or

transfer of live wildlife, including embryos and gametes, or sport hunting in a manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries;

(2) The specimen was captive-bred, in accordance with § 17.3, within the United States;

(3) All live specimens of that species held by the captive-breeding operation are managed in a manner that prevents hybridization of the species or subspecies;

(4) All live specimens of that species held by the captive-breeding operation are managed in a manner that maintains genetic diversity.

(5) Any export of or foreign commerce in a specimen meets the requirements of paragraph (g)(4) of this section, as well as parts 13, 14, and 23 of this chapter;

(6) Each specimen to be re-imported is uniquely identified by a tattoo or other means that is reported on the documentation required under paragraph (h)(5) of this section; and

(7) Each person claiming the benefit of the exception of this paragraph (h) must maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to Service officials for inspection at reasonable hours set forth in §§ 13.46 and 13.47 of this chapter.

(8) The sport-hunted trophy consists of raw or tanned parts, such as bones, hair, head, hide, hooves, horns, meat, skull, rug, taxidermied head, shoulder, or full body mount, of a specimen that was taken by the hunter during a sport hunt for personal use. It does not include articles made from a trophy, such as worked, manufactured, or handicraft items for use as clothing, curios, ornamentation, jewelry, or other utilitarian items for commercial purposes.

Dated: August 25, 2005.

**Paul Hoffman,**

*Acting Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 05–17432 Filed 9–1–05; 8:45 am]

**BILLING CODE 4310-55-P**

## DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

## 50 CFR Part 17

**RIN 1018–AI82**

## Endangered and Threatened Wildlife and Plants; Final Rule To List the Scimitar-Horned Oryx, Addax, and Dama Gazelle as Endangered

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), determine endangered status for scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) throughout their ranges, pursuant to the Endangered Species Act of 1973, as amended (Act). The best available information indicates that the causes of decline of these antelopes are (1) habitat loss through desertification, permanent human settlement, and competition with domestic livestock, and (2) regional military activity and uncontrolled killing. These threats have caused the possible extinction in the wild of the scimitar-horned oryx and the near-extinction of the addax in the wild. All three species are in danger of extinction throughout their ranges. Accordingly, we are listing these three antelopes as endangered.

**DATES:** This final rule is effective on October 3, 2005.

**ADDRESSES:** The complete file for this rule is available for inspection, by appointment, during normal business hours in the office of the Division of Scientific Authority, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 750, Arlington, Virginia 22203.

Requests for copies of the regulations regarding listed wildlife and inquiries about prohibitions and permits may be addressed to: Division of Management Authority, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 700, Arlington, Virginia 22203 (telephone, 703–358–2104; fax, 703–358–2281).

**FOR FURTHER INFORMATION CONTACT:** Robert R. Gabel, Chief, Division of Scientific Authority, at the above address; by telephone, 703–358–1708; by fax, 703–358–2276; or by e-mail, *Scientificauthority@fws.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The scimitar-horned oryx stands about 47 inches [in, 119 centimeters

(cm)] tall and weighs around 450 pounds [lb, 204 kilograms (kg)]. It is generally pale in color, but the neck and chest are dark reddish brown. As the name suggests, adult animals possess a pair of horns curving back in an arc up to 50 in (127 cm) long. The scimitar-horned oryx once had an extensive range in North Africa throughout the semi-deserts and steppes north of the Sahara, from Morocco to Egypt.

The addax stands about 42 in (106 cm) tall at the shoulder and weighs around 220 lb (100 kg). It is grayish white and its horns twist in a spiral up to 43 in (109 cm) long. The addax once occurred throughout the deserts and sub-deserts of North Africa, from the Atlantic Ocean to the Nile River.

The dama gazelle stands about 39 in (99 cm) tall at the shoulder and weighs around 160 lb (72 kg). The upper part of its body is mostly reddish brown, whereas the head, rump, and underparts are white. Its horns curve back and up, but reach a length of only about 17 in (43 cm) long. The dama gazelle, the largest of the gazelles, was once common and widespread in arid and semi-arid regions of the Sahara.

Of the three antelope species, the scimitar-horned oryx has been the most susceptible to the threats it faced. In Egypt, the species became extinct over a century ago (M. Riad, Minister of State for Environmental Affairs, *in litt.,* August 2003). By the mid-1900s, intensive killing had extirpated the scimitar-horned oryx from Morocco (Fact sheet submitted to the Service by M. Anechoum, Secretary General, Department of Waters and Forests in the Campaign Against Desertification, Morocco, pers. com., September 2003). By the mid-1980s, it was estimated that only a few hundred were left in the wild, with the only viable populations known to be in Chad. There have been no reported sightings of this species in the wild since the late 1980s. The World Conservation Union (IUCN) has declared the species extinct in the wild (IUCN 2003). In 1983, it was listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Captive-bred specimens are being introduced into large fenced areas in Morocco and Tunisia, and these animals may be released into the wild when adequately protected habitat is available (Antelope Taxon Advisory Group 2002b).

It is believed that the addax was extirpated from Tunisia during the 1930s, and the last animals were killed in Libya and Algeria in 1966 and 1970, respectively. The last observation of addax in Egypt was in the 1970s (Riad,



# Congressional Record

United States
of America

**PROCEEDINGS AND DEBATES OF THE** 113th **CONGRESS, SECOND SESSION**

*Vol. 160*     WASHINGTON, WEDNESDAY, JANUARY 15, 2014     *No. 9—Book II*

# House of Representatives

EXPLANATORY STATEMENT SUBMITTED BY MR. ROGERS OF KENTUCKY, CHAIRMAN OF THE HOUSE COMMITTEE ON APPROPRIATIONS REGARDING THE HOUSE AMENDMENT TO THE SENATE AMENDMENT ON H.R. 3547, CONSOLIDATED APPROPRIATIONS ACT, 2014

The following is an explanation of the Consolidated Appropriations Act, 2014.

This Act contains the twelve regular appropriations bills for fiscal year 2014. The divisions contained in the Act are as follows:

● Division A—Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2014;

● Division B—Commerce, Justice, Science, and Related Agencies Appropriations Act, 2014;

● Division C—Department of Defense Appropriations Act, 2014;

● Division D—Energy and Water Development and Related Agencies Appropriations Act, 2014;

● Division E—Financial Services and General Government Appropriations Act, 2014;

● Division F—Department of Homeland Security Appropriations Act, 2014;

● Division G—Department of the Interior, Environment, and Related Agencies Appropriations Act, 2014;

● Division H—Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2014;

● Division I—Legislative Branch Appropriations Act, 2014;

● Division J—Military Construction and Veterans Affairs and Related Agencies Appropriations Act, 2014;

● Division K—Department of State, Foreign Operations, and Related Programs Appropriations Act, 2014; and

● Division L—Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2014.

Section 3 of the Act states that, unless expressly provided otherwise, any reference to "this Act" contained in any division shall be treated as referring only to the provisions of that division.

Section 4 of the Act specifies that this explanatory statement shall have the same effect with respect to the allocation of funds and implementation of this legislation as if

it were a joint explanatory statement of a committee of conference.

Section 5 of the Act provides a statement of appropriations.

Section 6 of the Act states that each amount designated by Congress as being for Overseas Contingency Operations/Global War on Terrorism is contingent on the President so designating all such amounts and transmitting such designations to Congress. The provision is consistent with the requirements in the Budget Control Act of 2011 for Overseas Contingency Operations/Global War on Terrorism designations by the President.

Section 7 of the Act addresses possible technical scorekeeping differences for fiscal year 2014 between the Office of Management and Budget and the Congressional Budget Office.

Section 8 of the Act includes the text of the Senate amendment to H.R. 3547, relating to launch liability extension.

The Act does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined by clause 9 of rule XXI of the Rules of the House of Representatives.

DIVISION A—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2014

CONGRESSIONAL DIRECTIVES

The explanatory statement remains silent on provisions that were in both the House Report (H.Rpt. 113–116) and Senate Report (S.Rpt. 113–46) that remain unchanged by this agreement, except as noted in this explanatory statement.

The agreement restates that executive branch wishes cannot substitute for Congress' own statements as to the best evidence of congressional intentions, which are the official reports of the Congress. The agreement further points out that funds in this Act must be used for the purposes for which appropriated, as required by section 1301 of title 31 of the United States Code, which provides: "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."

The House and Senate report language that is not changed by the explanatory statement is approved and indicates congressional intentions. The explanatory statement, while repeating some report language for emphasis, does not intend to negate the

language referred to above unless expressly provided herein.

In cases in which the House or the Senate have directed the submission of a report, such report is to be submitted to both the House and Senate Committees on Appropriations no later than 60 days after enactment, unless otherwise directed.

Hereafter, in Division A of this statement, the term 'the Committees' refers to the Committees on Appropriations of the House of Representatives and the Senate.

TITLE I—AGRICULTURAL PROGRAMS

PRODUCTION, PROCESSING AND MARKETING

OFFICE OF THE SECRETARY

(INCLUDING TRANSFERS OF FUNDS)

The agreement provides $43,778,000 for the Office of the Secretary.

The following table reflects the agreement:

OFFICE OF THE SECRETARY
[Dollars in thousands]

| | |
|---|---|
| Office of the Secretary | $5,051 |
| Office of Tribal Relations | 498 |
| Office of Homeland Security and Emergency Coordination | 1,496 |
| Office of Advocacy and Outreach | 1,209 |
| Office of Assistant Secretary for Administration | 23,590 |
| Departmental Administration | (22,786) |
| Office of Assistant Secretary for Congressional Relations | 3,869 |
| Office of Communications | 8,065 |
| | |
| Total, Office of the Secretary | $43,778 |

During fiscal year 2013, the Department of Agriculture (USDA) failed to communicate to the Committees information related to a number of Congressional priorities. In particular, the Department failed to provide timely updates on major spending changes for the Modernize and Innovate the Delivery of Agricultural Systems and the Rental Assistance Program among others. In fiscal year 2014 and beyond, it is incumbent upon USDA to promptly notify the Committees in writing and via briefing on major changes in projects or programs in order for the Committees to fulfill their oversight responsibilities.

The agreement reiterates that reports requested by the Committees are an important part of congressional oversight. The Department is consistently delinquent in submitting these reports, especially due to excessively long reviews in the Office of the Secretary. The Secretary is directed to ensure that the dates and directives, which are

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.


Printed on recycled paper.

USCA Case #15-5070     Document #1567099     Filed: 08/10/2015     Page 75 of 75

NATURAL RESOURCE DAMAGE ASSESSMENT AND RESTORATION

NATURAL RESOURCE DAMAGE ASSESSMENT FUND

The bill provides $6,263,000 for the Natural Resource Damage Assessment Fund. The detailed allocation of funding by activity is included in the table at the end of this explanatory statement.

WORKING CAPITAL FUND

The bill provides $57,000,000 for the Department of the Interior, Working Capital Fund.

GENERAL PROVISIONS, DEPARTMENT OF THE INTERIOR

(INCLUDING TRANSFERS OF FUNDS)

The agreement includes various legislative provisions affecting the Department in Title I of the bill, "General Provisions, Department of the Interior." Several of these provisions have been carried in previous years and others are newly proposed this year. The provisions are:

Section 101 provides Secretarial authority for the intra-bureau transfer of program funds for expenditures in cases of emergencies when all other emergency funds are exhausted.

Section 102 provides for the Department-wide expenditure or transfer of funds by the Secretary in the event of actual or potential emergencies including forest fires, range fires, earthquakes, floods, volcanic eruptions, storms, oil spills, grasshopper and Mormon cricket outbreaks, and surface mine reclamation emergencies.

Section 103 provides for the use of appropriated funds by the Secretary for contracts, rental cars and aircraft, telephone expenses, and other certain services.

Section 104 provides for the transfer of funds from the Bureau of Indian Affairs and Bureau of Indian Education, and Office of the Special Trustee for American Indians.

Section 105 permits the redistribution of tribal priority allocation and tribal base funds to alleviate funding inequities.

Section 106 authorizes the acquisition of lands for the purpose of operating and maintaining facilities that support visitors to Ellis, Governors, and Liberty Islands.

Section 107 continues Outer Continental Shelf inspection fees to be collected by the Secretary of the Interior.

Section 108 authorizes the Bureau of Land Management to implement an oil and gas leasing Internet program.

Section 109 authorizes the Secretary of the Interior to continue the reorganization of the Bureau of Ocean Energy Management, Regulation, and Enforcement in conformance with Committee reprogramming guidelines.

Section 110 allows the Bureau of Indian Education to utilize funds recovered from grants or Indian Self-Determination Act contracts to Tribes upon re-assumption of school operations by the Bureau.

Section 111 provides the Secretary of the Interior with authority to enter into multiyear cooperative agreements with non-profit organizations for long-term care of wild horses and burros.

Section 112 addresses the U.S. Fish and Wildlife Service's responsibilities for mass marking of salmonid stocks.

Section 113 provides authority for the Department to accept public and private contributions for the orderly development and exploration of Outer Continental Shelf Resources.

Section 114 continues a provision which directs the Secretary of the Interior to make certain certifications with respect to existing rights of way. The section also retains a provision limiting funding for a proposal to approve specified rights-of-way on the Mojave National Preserve or lands managed by

the Needles Field Office of the Bureau of Land Management.

Section 115 modifies the management designation of Sunrise Mountain Instant Study Area, Nevada.

Section 116 limits funding for energy generation facilities on Bureau of Land Management lands already identified as exclusion lands by the Department of the Interior.

Section 117 extends certain pay authorities.

Section 118 extends authorization for certain payments to the Republic of Palau for fiscal year 2014.

Section 119 extends the authorizations of 12 National Heritage Areas through fiscal year 2015.

Section 120 redesignates the White River National Wildlife Refuge.

Section 121 makes a technical correction to section 206 of Public Law 97–451 related to civil penalties.

Section 122 addresses Bureau of Land Management actions regarding grazing on public lands.

Section 123 provides the Secretary of the Interior certain pay authorities.

Section 124 continues a provision prohibiting funds to implement, administer, or enforce Secretarial Order 3310 issued by the Secretary of the Interior on December 22, 2010.

Section 125 provides for the trailing of livestock across public lands through fiscal year 2015.

Section 126 redesignates the Nisqually National Wildlife Refuge visitor center.

Section 127 directs the Secretary of the Interior to reissue a rule pertaining to wildlife.

TITLE II—ENVIRONMENTAL PROTECTION AGENCY

The bill provides $8,200,000,000 for the Environmental Protection Agency (EPA). Unless explicitly stated in the explanatory statement or included in the table accompanying the statement, funds have only been provided for fixed cost needs and for existing programs and activities.

*Congressional Budget Justification.*—The Agency is directed to continue to include the information requested in House Report 112-331 and any proposals to change State allocation formulas that affect the distribution of appropriated funds in future budget justifications.

*Reprogramming.*—The Agency is held to the reprogramming limitation of $1,000,000 and should continue to follow the reprogramming directives as provided in the front of this statement. Further, the Agency may not use any amount of deobligated funds to initiate a new program, office, or initiative, without the prior approval of the Committees.

Within 30 days of enactment of this Act, the Agency is directed to submit to the House and Senate Committees on Appropriations its annual operating plan for fiscal year 2014, which shall detail how the Agency plans to allocate funds at the program project level.

SCIENCE AND TECHNOLOGY

The bill provides $759,156,000 for Science and Technology programs and transfers $19,216,000 from the Hazardous Substance Superfund account to this account. The bill provides the following specific funding levels and direction:

*Indoor Air and Radiation.*—The bill provides $6,449,000. The proposed elimination of radon activities has been rejected.

*Research: National Priorities.*—The bill provides $4,234,000 which shall be used for extramural research grants, independent of the Science to Achieve Results grant program, to fund high-priority water quality and availability research by not-for-profit orga-

nizations who often partner with the Agency. Funds shall be awarded competitively with priority given to partners proposing research of national scope and who provide a 25 percent match. The Agency is directed to allocate funds to grantees within 180 days of enactment of this Act.

*Research: Safe and Sustainable Water Resources.*—The bill provides $111,018,000. The proposed elimination of the beach program has been rejected and funding for this program has been restored within the funds provided.

*Research: Sustainable and Healthy Communities.*—The bill provides $154,978,000. Funding is included for the Agency's STAR and the Greater Research Opportunities fellowship programs consistent with fiscal year 2013 levels.

*Additional Guidance.*—The agreement includes the following additional guidance:

*Endocrine Disruptor Research.*—There has been longstanding interest in EPA's effort in determining possible health and environmental effects of chemicals. To improve analysis of chemicals, EPA needs to improve its scientific understanding of chemical properties in order to better inform the Agency's Contaminant Candidate List as required by the Safe Drinking Water Act; Air Toxics Strategy as required under the Clean Air Act; and all required activities under the Toxic Substances Control Act. EPA is directed to follow the directives and recommendations in House Report 112–589 with respect to Endocrine Disruptor Research.

*Integrated Risk Information System (IRIS).*—The Committees note that House Report 112-331 directed EPA to contract with the National Academy of Sciences (NAS) to conduct reviews of IRIS assessments with the goal of improving EPA's IRIS assessments. The Committees recognize that the agreed-upon NAS review is ongoing and that the Agency is taking steps to address previous NAS recommendations. To that end, the Agency shall include in each draft and final IRIS assessment released in fiscal year 2014, documentation describing how EPA has implemented or addressed NAS Chapter 7 recommendations. If any recommendations were not incorporated, the Agency should explain its rationale.

Further, EPA should ensure the new draft of the formaldehyde assessment reflects those recommended improvements. Specifically, EPA should adhere to the recommendation in Chapter 7 of the NAS report that "strengthened, more integrative and more transparent discussions of weight of the evidence are needed." Conducting a risk assessment for formaldehyde presents many challenges, due largely to the significant database for this compound. Although several evaluations have been conducted, none has formally integrated toxicological and epidemiological evidence. EPA should ensure the forthcoming revised draft IRIS assessment of formaldehyde is a model of transparency and represents an objective and robust integration of the scientific evidence.

The Committees understand EPA has decided to make further revisions to the acrylonitrile assessment to more fully address scientific issues in the assessment. Therefore, the Agency is directed to review methods previously used to evaluate and interpret the body of available scientific data, including the weight-of-evidence approach. Further, and no later than May 1, 2014, the Agency shall provide to the House and Senate Committees on Appropriations a progress report that describes the Agency's implementation of NAS Chapter 7 recommendations for fiscal years 2012 and 2013.

The progress report shall include a chapter on whether there are more appropriate scientific methods to assess, synthesize and