**No. 15-5070**
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

FRIENDS OF ANIMALS,
Appellant,

v.

SALLY JEWELL, in her official capacity as the Secretary of the Interior, and
the U.S FISH AND WILDLIFE SERVICE, an agency of the United States
Appellees,

and

SAFARI CLUB INTERNATIONAL,
Intervenor-Appellee.

_____

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. Civ. No. 14-0357

_____

APPELLANT'S REPLY BRIEF

Michael Ray Harris
Jennifer E. Barnes
Friends of Animals
7500 East Arapahoe Road, Suite 385
Centennial, CO 80112
Telephone: 720-949-7791

*Counsel for Appellant*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**GLOSSARY** ............................................................................................................... iv

**REPLY ARGUMENT** ..................................................................................................1

    **A. ARTICLE III STANDING** ..............................................................................1

        **1.  Section 10(c) provides a clear right to specific information pertaining to an application for a Section 10(a)(1) take permit** ...........................................................3

        **2. FoA has sufficiently alleged that deprivation of information under Section 10(c) pertaining to take of African Antelope on U.S. hunting ranches caused the organization and its members particularized harm because the organization and its members have a valid use for such information** ..............................4

        **3. This Court's Opinion in *Lyng* does not compel a different result** ...........................................................................5

    **B.    SEPARATION OF POWERS DOCTRINE** ..........................................7

        **1. *Plaut*, not *Wheeling*, is controlling in this case** ...........................7

        **2. Alternatively, the Court should apply *Klein* to hold Section 127 unconstitutional** .............................................10

        **3. The focus here should be on what Congress did, not what it could have done** ....................................................11

**CONCLUSION** ...........................................................................................................13

**CERTIFICATE OF COMPLAINCE** .......................................................................15

**CERTIFICATE OF SERVICE** .................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Salazar,* 672 F. 3d 1170
(9TH Cir. 2012) ......................................................................................... 11

*Alliance for the Wild Rockies v. Salazar,* 800 F. Supp. 2d 1123
(D. Mont. 2011) ........................................................................................ 11

*Am. Canoe Ass'n v. City of Louisa Water Treatment Plant,*
389 F.3d 536 (6TH Cir. 2004) ............................................................ 2, 4, 6, 7

*ASPCA v. Feld Entm't, Inc.,* 659 F.3d 13 (D.C. Cir. 2011) ................................. 1, 3

*Bensman v. United States Forest Service,* 408 F.3d 945
(7th Cir. 2005) ......................................................................................... 3, 4

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) ..................................................................................... 9

*FEC v. Akins,* 524 U.S. 11 (1998) ........................................................... 1, 2, 6, 7

*Foundation on Economic Trends v. Lyng,* 943 F.2d 79
(D.C. Cir. 1991) ...................................................................................... 2, 5, 6

*Friends of Animals v. Salazar,* 626 F. Supp. 2d 102
(D.D.C. 2009) ........................................................................................ 1, 3, 9

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) ................................... 4, 5

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ......................................... 1

*National Employees Union v. United States,* 101 F.3d 1423
(D.C. Cir. 1996) ........................................................................................... 5

*National Wildlife Federation v. Marsh,* 568 F. Supp. 985 (D.D.C. 1983) ....... 9

*Pennsylvania v. Wheeling & Belmont Bridge Co.,** 59 U.S. (18 How.) 421
(1856) ...................................................................................................... 7, 8

*Plaut v. Spendthrift Farm,* 514 U.S. 211 (1994)* ................................. 7, 8, 9, 12

*Robertson v. Seattle Audubon Society,* 503 U.S. 429 (1992) .................. 10, 11

*Safari Club Int'l v. Jewell,* 281 F.R.D. 32 (D.D.C. 2012) ......................................... 1

*Save Our Mall v. Norton,* 269 F.3d 1092 (D.C. 2001) ......................................... 11

*Summers v. Earth Island Inst.,* 555 U.S. 488 (2009) ............................................ 7

*State of Pennsylvania v. The Wheeling and Belmont Bridge*

*Company*, 59 U.S. 421 (1855) ....................................................... 35-36, 44

*Wilderness Society v. Rey*, 622 F.3d 1251 (9th Cir. 2010) ................................4

*United States v. Klein*,* 80 U.S. 128 (1871) .................................... 10, 12

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ...................................8


## Statutes

16 U.S.C. § 1539 ....................................................................................3


## Rules and Procedures

Fed. R. Civ P. 2....................................................................................7


## Other

Cross Motion for Summery Judgment and Memorandum in Support by Sally Jewell *et al.* at 20, *Friends of Animals v. Jewell*, Civ. No. 14-0357 (D.D.C. Sept. 11, 2014) (ECF 17)....................................................8

Timothy Stoltzfus Jost, *From Swift to Stotts and Beyond: Modification of Injunctions in the Federal Courts*, 64 Tex. L. Rev. 1101 (1986) ...............8

Kelsey Kennedy, *Endangered Species Act: Repeal and Reform or Leave it Alone*, LawStreet (December 3, 2014)..............................................12

William Bradford Reynolds, *The Challenge for Constitutional Respect in America*, 11 Harv. J.L. Pub. Pol'y 13, 15 (1988) ...........................................13


Scott J. Shapiro, *What the Rule of Recognition is (and Does it Exist)?*, In the rule of recognition and the U.S. constitution 235, 261 (Matthew D. Adler & Kennith Einar Himma, eds 2009) ...........................................13

# GLOSSARY

**Antelope I:** *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009).

**Antelope III:** *Safari Club International v. Salazar, et al.*, Case No. 11-cv-01564 (D.D.C.).

**Antelope IV:** *Friends of Animals v. Ashe et al.*, 1:13-cv-1580 (D.D.C.).

**APA:** Administrative Procedure Act.

**ESA:** Endangered Species Act.

**FoA:** Friends of Animals.

**FWS:** United States Fish and Wildlife Service.

**Section 127 or Budget Rider:** Section 127 of the Consolidated Appropriations Act, 2014 (H.R. 3547, 113th Cong., S. 127).

**Three Antelope Species or African Antelope:** scimitar-horned oryx (*Oryx dammah*), dama gazelle (*Gazella dama*), and addax (*Addax nasomaculatus*).

## REPLY ARGUMENT

## A.    ARTICLE III STANDING.

On the jurisdictional issue before the Court, the Federal Appellees' argument amounts to a Standing Lollapalooza—an extraordinary compilation of a quarter century of Article III jurisprudence. This impressive list of cases, however, cannot hide a simple, and most important, truth: that Friends of Animals (and others similarly situated) had, until 2014, a **clear** statutory right under Section 10(c) of the Endangered Species Act ("ESA") to **specific** information regarding certain "take" of captive, but endangered African Antelopes on trophy hunting ranches in the United States. This informational right was previously acknowledged by the District Court in both *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009) (*Antelope I* and *Safari Club Int'l v. Salazar,* 281 F.R.D. 32, 40-41 (D.D.C. 2012)(*Antelope III*), as well as by this Court in *ASPCA v. Feld Entm't, Inc.,* 659 F.3d 13 (D.C. Cir. 2011). It was this right that was extinguished, to the detriment of FoA and its members, by Congress when it unconstitutionally attached the Budget Rider to the Consolidated Appropriations Act of 2014.

In arguing that these facts cannot form the basis for Article III standing, the Federal Appellees' rely upon the wrong legal standard not once, but twice. First, the appropriate analysis here is not under *Lujan*. As the Supreme Court recognized in *Akins*, where informational standing is alleged, the appropriate analysis is whether the plaintiff can: (1) reasonably read a statute as requiring disclosure of specific information; and (2) show that it has been denied the information to which it is entitled. If plaintiff can do so, it has demonstrated a concrete injury and need not also show, as suggested by the Federal Appellees, some other independent injury under *Lujan*. Instead, what *Akins*,

1

*Lyng*, and *American Canoe* address is under what circumstances would deprivation of statutorily mandated information also cause injury that would be **sufficiently particular** to a party seeking to invoke Article III standing. For example, in cutting off the right to information under Section 10(c) regarding the Three Antelope Species, Congress arguably injured all Americans. FoA, however, has also demonstrated that its past (and proposed future) use of this specific information, which it was lawfully entitled to, caused an injury particular to it and its members. This is why FoA has Article III standing to challenge the Budget Rider while many other Americans may not.

Second, the Federal Appellees further rely on the wrong legal standard by suggesting that under *Lyng*, **an organization** cannot rely upon informational injury alone to demonstrate standing, but must establish some other invasion of a legally protected interest. In *Lyng*, the Court, which ultimately declined to even decide the question of information standing, ruling instead that the plaintiff had not alleged any final agency action, never suggested that deprivation of statutorily mandated information cannot constitute concrete injury to an organization. Instead, as already stated, it questioned whether such injury was sufficiently particularized with out some other showing. As *Akins* and *American Canoe* would later explain, to demonstrate that the information injury is particularized to an individual or organizational plaintiff, what must be shown is not another concrete injury (making informational injury meaningless), but instead some additional plus—namely, that the information would be useful in some meaningful way to the plaintiff. FoA has done that here.

2

**1.    Section 10(c) provides a clear right to specific information pertaining to an application for a Section 10(a)(1) take permit.**

The Federal Appellees' assertion that Section 10(c) constitutes nothing more than a "notice and comment" provision that provides no statutory right of information is borderline frivolous. Federal Appellees' Response Brief ("Fed. Resp. Br.") at 22-23. Section 10(c) not only provides that the government must publish in the Federal Register "each application for an exemption or permit," but also that "**[i]nformation received by the Secretary [of the Interior] as part of any application shall be available to the public as a matter of public record at every stage of the proceeding**." 16 U.S.C. § 1539(c). These provisions have been held to provide an informational right. *Friends of Animals*, 626 F. Supp. 2d at 111-113; *see also ASPCA v. Feld Entm't, Inc.,* 659 F.3d at 22–23  (noting that if a party were to seek a Section 10 take permit, then "Section 10(c) would [] entitle [other interested parties] to obtain the information received by the Service as part of [the] permit application").

The specificity of Section 10(c) is a far cry from the language in the Decision Making and Appeals Reform Act ("DMAR"), which was the subject in the cases cited by the Federal Appellees. For example, in *Bensman v. United States Forest Service*, the court declined to find informational standing under DMAR because no provision in that Act or its implementing regulations required the agency to produce or publish information and "[t]herefore, under [plaintiffs'] theory, there simply is no information to which [plaintiff] may claim an entitlement." 408 F.3d 945, 957 (7th Cir. 2005). The Court explicitly found that standing alone, the applicable statute could not provide a right to information, "because the statute contemplates that the deciding

3

officer might not even make a decision with respect to the matters raised on appeal." *Id.* at 958. Similarly, in *Wilderness Society v. Rey*, the Ninth Circuit found that DMAR did not provide a right to information and explained the "principal question after *Akins*, for purposes of 'injury in fact,' is whether Congress or any other source of law gives the litigant a right to bring suit." 622 F.3d 1251, 1259 (9th Cir. 2010) (citation omitted).

### 2. FoA has sufficiently alleged that deprivation of information under Section 10(c) pertaining to take of African Antelope on U.S. hunting ranches caused the organization and its members particularized harm because the organization and its members have a valid use for such information.

Once a party demonstrates that governmental action has deprived it of information that it has a statutory right to obtain, the only remaining burden on that party is to demonstrate a particularized need (or use) for that information. Such a burden is minimal and has been met by FoA. As the Sixth Circuit concluded, it is enough that a party can show that the withholding of the information "negatively affected" their "interests." *American Canoe Association v. City of Louisa Water Treatment Plant*, 389 F.3d 536, 556 (6th Cir. 2004); *see also FEC v. Akins*, 524 U.S. 11, 21 (1998)(noting that "[t]here is no reason to doubt [plaintiffs'] claim that the information [from the Federal Elections Commission] would help them (and others to whom they would communicate it) to evaluate candidates for public office . . . and to evaluate the role that [] financial assistance might play in a specific election").

The cases cited by Federal Appellees regarding organization standing do not suggest that the burden is higher on FoA when its alleged injury is deprivation of information under a statute. In *Havens*, for example, while it is true that one of the organization's members successfully pled informational

4

injury to him individually, the organizational plaintiff did not claim informational injury at all. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 and 378-79 (1982). The organization proceeded under the assertion that the plaintiff's racial discrimination practices as a whole were the source of its concrete and particularized injury. *Id*. at 378-79. Generally, an organization bringing litigation on its on behalf must demonstrate concrete injury by demonstrating a clear conflict between the defendant's conduct and the organization's mission. Thus, we agree with the government's assessment of *National Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996). But that case was not one that involved an organization that had suffered informational injury under *Akins*.

###    3.    This Court's Opinion in *Lyng* does not compel a different result.

 Federal Appellees' argue that *American Canoe* is flatly inconsistent with this Court's decision in *Lyng*. FoA acknowledges that in *Lyng* the Court expressed great concern over whether informational standing might open the floodgates to litigation, particularly under environmental statutes. *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84-85 (D.C. Cir. 1991). There are, however, several important points about *Lyng* that the government ignores and/or fails to disclose.

First, while expressing concern over the standing issue, the Court went on to decide the case on other grounds. Specifically, the Court found that the right to information, if there was one at all, under the National Environmental Policy Act ("NEPA") is triggered only when there is a proposed major federal action that would significantly impact the environment. In *Lyng*, the Court could find no such proposed major federal action. As such, it found that even if

NEPA provided one a right to information, the plaintiff had failed to "'identify any particular 'agency action' that was the source of [its] injuries.'" *Id.* at 85-87 (citations omitted).

Second, in *Lyng* the Court never actually concluded that deprivation of information required to be disclosed under a statute could not constitute "concrete" injury under Article III. To the contrary, despite the Court's concerns, for purposes of that case it assumed that NEPA did create an informational right and that the plaintiff suffered informational harm. *Id*. at 85.

Third, and most important, when read carefully, it seems that the Court was not concerned about whether or not deprivation of information was concrete harm, but again, whether such harm was too generalized in that it could be suffered by everyone. As the Court explained, "informational injury, in its broadest sense, exists day in and day out, whenever federal agencies are not creating information a member of the public would like to have. If such injury alone were sufficient, a prospective plaintiff could bestow standing upon itself in every case merely by requesting the agency to prepare the detailed statement NEPA contemplates." *Id*.

This leads to the final point undisclosed by the government—*Lyng* was decided in 1991, nearly 9 years before the Supreme Court decision in *Akins*. As noted above, in *Akins* the Supreme Court could have decided that informational injury is neither concrete nor particularized. It did not. It preserved Congress's right to establish certain rights, the deprivation of which would create a concrete harm, while placing the burden on the party invoking the right to demonstrate a particularized need for the information different then that of the general public. In this regard, *American Canoe*, which was

6

decided in 2004, is the most thorough and persuasive application of *Akins* in the context of an environmental statute that provides a specific right to information.[1]

**B.    SEPARATION OF POWERS DOCTRINE.**

    **1.    *Plaut*, not *Wheeling*, is controlling in this case.**

Congress' adoption of Federal Rule of Civil Procedure 2 in 1938 sought to merge law and equity into a single civil jurisdiction. In practice, true merger has remained elusive. Indeed, the distinction between the two is critical to this very case. As the government acknowledges, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421 (1856), the case they claim this Court must follow, is a suit in equity, which the Supreme Court acknowledged in its opinion would have come out decidedly different (to FoA's advantage) if it would have been an action in law. *Id.* at 431. *Plaut v. Spendthrift Farm*, 514 U.S. 211 (1994), on the other hand, involved the interpretation of a statute, and although decided well after the merger, would have been an action in law if decided before 1938. The case at bar can also be characterized as an action in law for three reasons.

---

[1] In *Akins*, the Supreme Court could have gone the route it took in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), a case also relied upon by the government, but did not. *Summers* also did not involve information injury; it instead asserted the deprivation of a right to participate in certain government rulemaking activities, or what has been called "procedural injury." *Summers* arguably stands for the proposition that a procedural injury is neither concrete nor particularized. *Id.* at 496-97. In other words, to vindicate a procedural right, even a statutory one, a plaintiff must demonstrate a separate injury. Again, this is not the case for an informational right, as made clear in *Akins.*

First, it did not involve an injunction, which in suits in equity always remain subject to amendment by the Court and thus, despite the Federal Appellees' assertion to the contrary, are not equivalent to a final judgment. *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent."). Notably, in *Wheeling*, the fact that Congress has altered the law was only one reason that the bridge company sought relief from the injunction. It also claimed that the court failed to require bond, and made several other equitable mistakes. 59 U.S. at 428. Regardless, injunctions are a particular perspective remedy, and one of the long understood reasons for their modification is where changes in the law come about. *See* Timothy Stoltzfus Jost, *From Swift to Stotts and Beyond: Modification of Injunctions in the Federal Courts*, 64 Tex. L. Rev. 1101, 1132 (1986).

Second, like in *Plaut*, what Congress has done here is to alter a judicial interpretation of a statute that established the legal rights of two specific groups of individuals—a few hundred trophy hunt ranch owners and those, like FoA's members, that oppose the hunting of captive African Antelope in the United States. While in its appeal brief the Federal Appellees make light of FoA's assertion that the *Antelope I* litigation involved "rights" (Fed. Resp. Br. at 36), this is a departure of their position in the District Court, where they expressly acknowledged that Section 127 purports to alter "public rights under the ESA for an entire class of individuals." Cross Motion for Summery Judgment and Memorandum in Support by Sally Jewell *et al.* at 20, *Friends of Animals v. Jewell*, Civ. No. 14-0357 (D.D.C. Sept. 11, 2014) (ECF 17). While FoA

would argue the rights altered are private, not public, the terminology is not the point.

In *Antelope I*, Judge Kennedy interpreted the statutory rights established for both permit applicants and interested parties under Section 10 of the ESA. The issuing of permits by an agency—such as contemplated under Section 10—is a delegation of judicial-like authority to adjudicate rights. *See National Wildlife Federation v. Marsh,* 568 F. Supp. 985, 992 n.12 (D.D.C. 1983). Adjudications by agencies under the Administrative Procedure Act determine rights and duties of individuals and include both an agency process and the right of any aggrieved person to seek review by a court. 5 U.S.C. § 702*; Chicago & Southern Air Lines v. Waterman Steamship Corp*., 333 U.S. 103, 113, 68 S. Ct. 431, 437, 92 L. Ed. 568 (1948)(administrative orders are reviewable when "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process"). In *Antelope I,* it was determined that the government could not by rule eliminate the requirement that each individual hunting ranch that proposed to take endangered African Antelope submit their own application under Section 10(a)(1). 626 F. Supp. 2d at 115-20. It also determined that groups like FoA had a statutory right to participate in each permitting process. *Id.* Congress cannot undermine Judge Kennedy's final adjudication of these rights with nothing more than a few words telling the agency (and this Court) to ignore him.

In this regard, this case is exactly like *Plaut*. In both cases: (1) the rights of individuals to participate (or not participate) in an adjudicative process were at issue; (2) a court had previously determined those rights by interpreting specific statutory language; and (3) Congress subsequently tried

9

to ignore the court so as to favor the rights of the losing party. Both cases offend our Constitution.

### 2.     Alternatively, the Court should apply *Klein* to hold Section 127 unconstitutional.

The Federal Appellees and the Intervenors believe that Section 127, which does not contain even an iota of substantive law in its short text, is a change in the law sufficient to distinguish this case from *Klein*. But neither party will tell us exactly what new statutory law was made that could be applied to the ongoing litigation in Antelope III and IV. Certainly, the process of listing species, the prohibition of take of endangered species, and the requirements of Section 10(a) and (c) were not altered by the Budget rider. Likewise, the legal status of the Three Antelope Species under the ESA remain the same in that captive antelope are legally endangered today, as are their wild counterparts. Nothing has changed in the ESA; what Congress has done is simply told FWS and the courts to ignore the ESA for purposes of deciding ongoing litigation.

In this regard, this case is nothing like any of the statutes at issue in cases where *Klein* was not followed. *See* Appellants Opening Brief at 39-47. FoA will not repeat the distinguishing factors in detail here. Instead, FoA implores the Court to carefully review the text of each of those statutes as described in the cases, as it will become clear that each had at least some substantive direction to the agency and effectively changed the law applicable to an ongoing court case. The statute in *Robertson*, the sole Supreme Court case, had the most substance, setting out specific new standards applicable to the project. Likewise, the bulk of the other cases involved Congress' decisions to get involved in federal projects that had stalled out due to litigation. In

10

doing so, Congress provided **substantive, new direction** to the agencies regarding what project to construct. Congress was essentially saying what you are doing isn't working, so we are now going to **explain exactly what to do**. Unlike here, one can read those statutes and understand that Congress was choosing to take back its previous delegation and use its legislative power to approve a specific project.

The riders in *Save Our Mall* and *Wild Rockies* are clearly the most problematic for FoA. Quite frankly, it is arguable that both were wrongly decided; certainly the district court judge in *Wild Rockies* thought so. *Alliance for the Wild Rockies v. Salazar,* 800 F. Supp. 2d 1123, 1125-27 (D. Mont. 2011). But the Court need not make that conclusion to find that Section 127 is unconstitutional. In those two cases, Congress did provide for some substantive change in the law, no matter how minimal, by effectively stripping away the right to judicial review.

At the end of the day, although they deny it, the Federal Appellees' and Intervenor's  positions are essentially that the use of the language "without regard to any other provision of law" in Section 127 is magical. But certainly, the lack of such language was not the defect for which the statute in *Klein* was struck down as unconstitutional, nor was it the focus of the *Robertson* court in upholding congressional action in that case.

### 3.    The focus here should be on what Congress did, not what it could have done.

It is asserted by the Federal Appellees that because Congress could "repeal the ESA root and branch," and, thus effectively eliminate any regulation of the Three Antelope Species, that Court should not be concerned about Congress instead taking the approach it did (which presumably is less

11

drastic in the government's mind). *See* Fed. Resp. Br. at 37. FoA agrees that Congress could have repealed the ESA or possibly even amended the statute to exempt captive African Antelope from regulation altogether. But this does not change the fact that Section 127 is unconstitutional for three reasons.

First, and most obvious, Congress did not repeal or amend the ESA. It instead overturned a judicial decision in *Antelope I* to benefit the losing parties. In doing so, it also interfered with the judiciary's consideration of the issues before it in *Antelope III* and *IV.*

Second, presumably Congress could also have found ways to effectuate legal changes to the statutes at issue in *Klein* and *Plaut* that would not have run afoul of the constitution. For instance, in *Klein*, Congress could have taken the drastic measure of repealing altogether the authority of the Executive Branch to return property sized during the Civil War. Congress did not, and like here, impermissibly chose to simply overturn a judicial interpretation of the law that authorized the Executive Branch to return the property to culpable, but presidentially pardoned, confederate solders. *United States v. Klein*, 80 U.S. 128, 141-142 (1871).

Finally, we cannot assume that an attempt by one or two members of Congress to repeal or substantively amend the text of the ESA through a budget rider would be successful. Such a rider would certainly draw more attention and opposition. Indeed, despite immense saber rattling over the ESA, no attempt to weaken the statute in the past two decades has been successful. *See* Kelsey Kennedy, *Endangered Species Act: Repeal and Reform or Leave it Alone*, LawStreet (December 3, 2014), *available at*
[http://lawstreetmedia.com/issues/health-science/endangered-species-act-](http://lawstreetmedia.com/issues/health-science/endangered-species-act-)

*repeal-reform-leave-alone/*. This is exactly why the Congressman who drafted Section 127 chose to pick its fight with the judiciary, not Congress itself.

## CONCLUSION

It has been said that our government exists as a result of a social agreement in which all "decline to trust the goodness of rulers to protect the rights of citizens." William Bradford Reynolds, *The Challenge for Constitutional Respect in America*, 11 Harv. J.L. Pub. Pol'y 13, 15 (1988). To allow Congress to change the law through a legislative rider that contains absolutely zero substantive language would flatly undermine the constitutional safeguards designed to offset the lack of trust in individual rulers and institutions. *See* Scott J. Shapiro, *What the Rule of Recognition is (and Does it Exist)?*, In the rule of recognition and the U.S. constitution 235, 261 (Matthew D. Adler & Kennith Einar Himma, eds 2009)("[T]he interpretive methodology that best furthers the designers' shared goals, values, and judgments of trustworthiness is the proper one for interpreting the authoritative texts and hence the content of the system's shared plan."). In passing the Budget Rider, Congress did not amend the ESA, devise any new legal principle to guide the permitting process under Section 10 of the Act, or in any way alter even a single substantive or procedural requirement applicable to the issuance of Section 10 permits. Simply put, the Budget Rider is a legislative effort to do one thing: reverse the decision in one resolved federal civil action, and, therefore, direct the outcome in the two other ongoing civil actions.

Thus, for the forgoing reasons, the Court should reverse the district court's decision.

Dated: December 4, 2015                    Respectfully submitted,


                                           s/ Michael Harris
                                           Michael Harris

                                           Attorney for Appellant

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,794 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I relied on my word processor to obtain this count.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced type using Microsoft Office 2013 in 14-point Cambria font.

Dated: December 4, 2015

 s/ Michael Harris

Michael Harris

**CERTIFICATE OF SERVICE**

I certify that on this 4th day of December, 2015, the foregoing, **Appellant's Reply Brief**, was served upon all counsel of record through the ECF system.

s/ Michael Harris

Michael Harris